**In re Gerald B. NEAL, Bankrupt.**

**Aaron C. DICKEY and Marion C. Dickey, Plaintiffs,**

**v.**

**Gerald B. NEAL and Ada B. Neal, Defendants.**

**Bankruptcy No. B-78-00526.**

United States Bankruptcy Court, D. Utah, Central Division.

March 31, 1980.

## MEMORANDUM DECISION

RALPH R. MABEY, Bankruptcy Judge.

This action, tried to the Court November 27, 1979, seeks a determination that a contractor's loss of funds paid him by a perspective home owner constitutes a nondischargeable obligation on the grounds of false pretenses or false representations and defalcation by a fiduciary. The Court finds no actionable false pretenses, false representations or defalcation by a fiduciary and holds the debt discharged. The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 752, Federal Rules of Bankruptcy Procedure.

The parties' business relationship began amicably on May 27, 1976, with the signing of an earnest money receipt and offer to purchase under which the defendant, Gerald B. Neal (hereinafter "Neal"), agreed to build a home for plaintiffs (hereinafter "Dickey").

At the time of this contract, Neal's reputation and credibility with his construction lender, Prudential Federal Savings, was very good. Two or three construction loans were outstanding at the time and, in immediately succeeding months, Neal would have as many as 12 to 15 homes under construction. His credit remained unimpaired until approximately November of 1977. Neal had the initial capability to complete the contract and no imputation of false pretense can be made from his entering into it.

The contract provided for the obtaining of a construction loan, upon joint application of the parties. Neal was to pay the loan costs and the parties were to share the interest expense. There is some question as to whether such an application was ever prepared. In any event, no such loan was obtained. Instead, Dickey deeded the lot upon which the home was to be constructed to Neal and Neal obtained the construction loan. It was an immutable requirement of the lender that the builder have title to the lot upon which a construction loan is to be granted and, therefore, this procedure was not unusual.

Gerald B. Hess, Clearfield, Utah, for defendants.

William G. Marsden, Salt Lake City, Utah, for plaintiffs.

■ Considerable testimony was given at trial to the effect that Dickey was not told by Neal that he had obtained a construction loan in Neal's own name until August of 1977. Dickey's lack of knowledge on this point (and apparent assumption that Neal was paying for the construction out of his own pocket) is said to have constituted a false pretense or false representation because it allowed Dickey to make payments on the purchase price of the home directly to Neal which payments were not applied against the construction loan. The weight of the evidence supports a finding, however, that Dickey knew, or at least had every objective indication from the beginning that Neal had obtained a construction loan in his name. The construction went forward almost immediately and must have been funded from some source. Dickey deeded his lot to Neal pursuant to an agreement most probably drawn by Art Clark, a friend and agent of Dickey who had substantial real estate expertise. Dickey, himself, had participated in the development of a number of building lots. Dickey and Clark must have understood that the deeding of the lot to Neal was for the purpose of complying with the lender's requirement so that Neal could obtain a construction loan. Indeed, the contract between the parties, which was drawn by Art Clark, appears to anticipate the deeding of Dickey's lot to Neal for the purpose of constructing a home. Furthermore, in documents prepared by Dickey dated February 14 and March 17, 1977, Dickey referred to interest payments on a construction loan, thereby evidencing knowledge that such a loan existed. Under the circumstances, the most credible evidence is that Dickey declined to provide the underlying personal financial information necessary to support a joint application for credit and, in view of the good relationship between the parties, Neal simply took it upon himself to obtain the financing in his own name for which purpose Dickey readily deeded his lot to Neal, taking back a position subordinate to the lender.

The house construction went forward in July of 1976 and was essentially completed five months later. The lender's inspector found the project to be 100 percent completed December 7, 1976, and the lender authorized disbursement of the remainder of the construction loan. The completed house included approximately $11,000 in "extras" agreed upon between the parties during the course of construction. Neal saw to the full payment of all material and labor used in the construction.

By December of 1976, the relationship between the parties had cooled. Dickey complained that the home had not been completed in 90 days as promised. This failure was particularly irksome since in partial payment for the construction of his home, Dickey had deeded to Neal a $9,000 lot upon which Neal had begun and completed his own home before the Dickey home was completed. There is, however, nothing in writing to substantiate the promise of completion within 90 days and, in any event, the home appears to have been completed with reasonable dispatch. More importantly, its completion was unsatisfactory to Dickey who complained that certain workmanship was done poorly and some things were simply left undone. He prepared a list of 23 complaints respecting the home which he gave to Neal on or about February 14, 1977. Ultimately, Neal remedied most of the complaints, gave credit to Dickey for remedying others, but left undone the smoothing of concrete in three bedrooms. On the other hand, Dickey apparently did not take up the carpet so that the project could be completed consistent with their agreement of March 17, 1977. In any event, Dickey had moved into the home in December of 1976 and remained there.

The center of the controversy is based upon Neal's failure to pay anything on the construction loan, notwithstanding payments to him by Dickey in the total amount of $32,000. The essential facts of these payments are as follows. The contract price for the house was $34,240 plus extras performed by Neal amounting to $10,000 or $11,000. Payment of $9,000 was made by Dickey in the summer of 1976 by deeding to Neal a building lot upon which Neal subsequently built his own house. For some

unexplained reason, however, Dickey retained a trust deed in this lot which was later sold for Dickey's benefit and as a result, Dickey now owns the former Neal home. By check dated December 28, 1976, Dickey paid Neal $10,000 which, logically, Neal could have applied to his own account to pay for the $10,000 to $11,000 in "extras" which had been built and financed by him. By check dated February 1, 1977, Dickey paid Neal $13,000 which Neal deposited in his general account.

The testimony surrounding the two payments by check conflicts. Dickey testified that Neal, puzzlingly, never asked for the payments and, indeed, was hard to find and seldom available to discuss the conclusion of their transaction. Neal testified that he was most anxious to "close" on the transaction by having Dickey pay off the construction loan and the balance owing to Neal and receive back the deed to the house. Neal needed the closing in order to stop the substantial interest from accruing on the construction loan and to provide him his profit. He testified that the lender would not accept partial payment on the construction loan although the Court finds this testimony to be incorrect.

The weight of the evidence and the logic of the circumstances support the factual conclusion that Dickey was anxious to conclude the transaction, but only when his list of construction complaints was fully satisfied. Neal was anxious to close the transaction immediately. Because of the parties' earlier friendly relationship and because of simple lack of communication and misunderstanding, there was reluctance on both sides to force the issue. Dickey made some partial payments; Neal made some efforts to satisfy the complaints and hoped for an early closing. In fact, the parties could not agree to closing terms until late November of 1977. By that time, unfortunately, Neal's financial fortunes had declined and his closing check, reliant upon an expected but unreceived deposit, bounced.

Dickey's claims against Neal total $16,098.80 plus interest and are based upon his 100 percent payment of the construction loan, his transfer of the lot to Neal and his payment of the $10,000 and $13,000 checks to Neal less the contract price of the house and the return of the lot through trust deed sale. The claimed false pretenses, false representations, and defalcation are based upon Neal's failure to make payments against the construction loan. But his failure to apply the value of the lot he received from Dickey against the construction loan is off-set by the return of the lot, through trust deed sale, to Dickey. The failure of Neal to apply the $10,000 check of December 28, 1976, to the construction loan may be answered initially by noting that Neal had provided approximately $11,000 in "extras" which had been funded by himself and to which he was entitled direct return. The failure of Neal to apply the $13,000 check of February 1, 1977, against the construction loan and, indeed, his failure to apply the earlier check and the credit on the lot against the construction loan may be explained by two facts: Neal was solvent through the entire winter and spring of 1977 and reasonably believed that he could deposit sums from Dickey or from other purchasers in his general account with the assurance that funds would be available for specific disbursements reflecting the amount of deposit when needed to accomplish closings or to make specific application of funds. In the present circumstance, Neal was involved in a dispute with Dickey. Neal anticipated in the ordinary course of business that final settling of accounts would be through a lender's or title company's closing agent and that, in the meantime, partial payments could be held in his general account. This explanation does not constitute justification for Neal's actions. It is, however, sufficient to preclude a finding of actionable false representation or false pretenses.

The Court further concludes that no fiduciary relationship arose between Neal and Dickey under the particular circumstances of this case. Dickey relies upon the case of matter of *In re Romero*, 535 F.2d 618 (10th Cir. 1976). The *Romero* court based its finding of a fiduciary duty between contractor and purchaser on a New

**334**

Mexico statute which provides for revocation or a suspension of a contractor's license on the ground of "diversion of funds or property received for . . . completion of a specific contract, or for a specified purpose in the . . . completion of any contract . . . ." The corresponding Utah statute, however, allows revocation only upon a showing of "*willful and deliberate* diversion of funds or property received under express agreement for prosecution or completion of a specific contract under this act, *or for a specified purpose in the prosecution or completion of any contract, and their application or use for any other contract, obligation or purpose, if with the intent to defraud* another." (Emphasis added.) Utah Code Ann. § 58-23-14. Therefore, unlike the New Mexico statute, the Utah statute does not impose a higher standard of care on the contractor in dealing with another's property than exists under common law. The Utah statute imposes the consequence of revocation or suspension of a license only where diversion of funds is accompanied by a *wrongful intent.* The New Mexico statute, however, requires no such finding of scienter before punishment by revocation or suspension of the contractor's license can be imposed. The absence in the New Mexico law of a scienter requirement clearly lowers the actionable level of conduct for which the New Mexico contractor can be liable. But since no fiduciary standard of care is established by the Utah statute, there is no statutory basis for holding Neal to the higher standard of a fiduciary. Furthermore, in the present circumstance, there is no willful and deliberate diversion of funds not any intent to defraud. Therefore, absent a statutory basis, and absent a basis in common law on the present facts, the Court concludes that no fiduciary duty existed between the parties within the meaning of 11 U.S.C. § 17a(4). Cf., *In re Agnelle d/b/a Angelle's Lumber Co.,* 610 F.2d 1335 (5th Cir. 1980).

### ORDER

1. Pursuant to the stipulation of the parties, the complaint against Ada B. Neal is dismissed with prejudice.

2. Based upon the foregoing memorandum decision, the complaint against Gerald B. Neal is dismissed, no cause of action, costs to the defendant. Defendant shall prepare judgment.