In re SPECIALIZED INSTALLERS, INC., Debtor.

CLIMAX MOLYBDENUM COMPANY, Plaintiff,

v.

SPECIALIZED INSTALLERS, INC., et al., Defendants,

and

SPECIALIZED INSTALLERS, INC., Third-Party Plaintiff,

v.

AVERY CONSTRUCTION COMPANY, Third-Party Defendant.

Bankruptcy No. 81 K 0391.

United States Bankruptcy Court, D. Colorado.

July 16, 1981.

548

Christopher Lane and William H. Rutter, Sherman & Howard, Denver, Colo., for plaintiff.

Michael A. Berniger, Berniger, Berg & Sterling, Colorado Springs, Colo., for defendants Specialized Installers, Inc., Lester H. Kahler, Jr., and Dorothy A. Kahler.

Robert M. Duitch, Duitch, Duitch & Gerig, Colorado Springs, Colo., for defendant Berniger, Berg & Sterling.

Terry D. Hendricks, Hendricks & Hendricks, Colorado Springs, Colo., for defendant The Western National Bank of Colorado Springs.

J. Royce Renfrow, Colorado Springs, Colo., for defendant Schmidt-Tiago Const. Co.

Leon R. Hetherington, Frisco, Colo., for third-party defendant Avery Const. Co.

MEMORANDUM

GLEN E. KELLER, Jr., Bankruptcy Judge.

Plaintiff, Climax Molybdenum Company (Climax), has filed a complaint against the Debtor and others seeking to recover $61,628.03 alleged to be held in trust by the Defendants. The facts are largely undisputed.

Climax owns and operates a large mine in Lake County, Colorado. The mine consists of a large open pit, a tailings pond, numerous warehouses and buildings, and a substantial amount of real property. Access to the pit is by means of various gravel roads. Very heavy equipment travels over the roads in summer and winter removing ore for processing. Climax contracts every year with various entities for delivery of "open pit sanding gravel" to be used on the roads. The gravel is used to give the vehicles traction in the winter and to form a surface for the road when the snow melts. It is also used in the pit for road maintenance purposes. Due to the nature of the heavy machinery, only gravel containing rock of more than $3/8$ of an inch in diameter is usable.

In August, 1980, Climax contracted with Specialized Installers, Inc., the Debtor herein, for delivery of 20 to 60 tons of open pit sanding gravel at $8.35 per ton. The written agreement was in the form of a purchase order with an addendum outlining additional terms of sale and conditions. The Debtor was first able to obtain gravel of the required dimensions from a placer mine near Alma, Colorado, and began delivering it to Climax. However, problems developed between the Debtor, the gravel supplier, and individuals who contracted to haul the rock to the mine. Thereafter, the Debtor entered into an agreement with Avery Construction Company (Avery) whereby Avery would furnish and deliver the gravel for $7.50 per ton. The Debtor, by its agreement dated October 27, was required to pay Avery the same day it received payment from Climax. Climax consented to the substitution of Avery and issued an appropriate change order on November 6. Avery began to perform and delivered a total of 7,326 tons. It was then instructed by Climax not to make further deliveries. Avery was told to stop either because its gravel was nonconforming or because Climax had obtained sufficient material to meet its needs. On November 7, Avery submitted its statement to the Debtor in the amount of $54,949.13.

During this time, the Debtor's financial position had been steadily deteriorating. Its account at Western National Bank in Colorado Springs was often overdrawn, and the size of the overdrafts was increasing. By November 21, the deficit had reached $16,082.35. The Bank had previously loaned the Debtor $30,000.00 secured by accounts receivable, equipment, and inventory. The loan was made on a term basis, and a substantial payment was expected by the Bank on December 1. Marc Millison, a representative of the Bank, indicated that the Specialized Installer's loan was considered a problem loan, and he was closely monitoring the Debtor's business. Daily phone contact with the Debtor was not uncommon.

The Debtor was also $29,000.00 in arrears on a note it had executed in favor of Schmidt-Tiago Construction Co., a supplier and the lessor of the premises from which the Debtor operated. Schmidt-Tiago was threatening to accelerate Debtor's obligation and to lock Debtor out of the premises. The Debtor consented to Schmidt-Tiago's proposal that its representative assist in the operation of the business. This was done and subsequently all checks from customers of the Debtor were made payable to the Debtor and Schmidt-Tiago jointly. Disputes over the propriety of this tactic prevented these checks from being cashed, further straining Debtor's cash flow.

Finally, the Debtor owed substantial taxes to the Internal Revenue Service, the State of Colorado, and local authorities, including employee withholding taxes. Lester Kahler, President of the Debtor corporation, stated that he was aware that such taxes, if not paid, could result in substantial personal liability.

The Debtor's financial situation became so serious that Kahler met with Michael Berniger, a Colorado Springs attorney, to discuss possible solutions to the problems that had arisen, particularly Schmidt-Tiago's threatened lockout. This meeting was on November 20, 1980, at the offices of Berniger, Berg & Sterling, P.C., in Colorado Springs. The possibility of filing bankruptcy was discussed. The next day, November 21, Climax issued a check payable to the Debtor in the amount of $61,628.03 as final payment under the gravel contract. Under the agreement between the Debtor and Avery, $54,949.13 of that money should have been paid to Avery that same day. Instead, Les Kahler went to the bank upon which the Climax check was drawn and obtained four cashier's checks. The first was for $5,000.00 and was made payable to Berniger, Berg & Sterling, P. C. The second was in the amount of $6,348.00 payable to Lester Kahler himself. The third check was for $18,861.03 payable to the Debtor corporation as was the fourth check in the amount of $31,519.00. The $5,000.00 was delivered to the Defendant law firm on November 24 as a retainer so that Berniger, Berg, & Sterling could proceed to file a petition under Chapter 11 of Title 11, United States Code, on behalf of the corporation. The $18,861.03 cashier's check was deposited at The Western National Bank of Colorado Springs and removed the overdraft of $16,082.35, plus $645.00 interest on the overdraft. The $31,519.00 cashier's check was deposited at another Colorado Springs bank, and on November 26, the corporation used approximately $24,000.00 of this fund to pay the IRS delinquent taxes. Later, on December 4th and 5th, Kahler transferred $12,147.52 into Specialized Installers' debtor-in-possession account at The Western National Bank of Colorado Springs. On November 26, the Debtor filed a Chapter 11 petition in this Court.

Avery, not having received payment from the Debtor, took steps to establish and foreclose a mechanic's lien against the mine at Climax for the $54,949.13 it was owed for handling the gravel. A notice of intent to file a lien was recorded on February 24, 1981. Climax entered into a settlement agreement in order to avoid foreclosure whereby Climax agreed to pay Avery in full in exchange for a release of the lien. Climax then commenced this proceeding against the Debtor, two of its officers, the Bank, and the law firm of Berniger, Berg & Sterling. The complaint seeks to compel the Debtor to perform its trust by paying to Plaintiff any moneys remaining under its control that are traceable to the $61,628.03 Climax check. In addition, the complaint seeks judgment in the amount of $54,949.13, less any trust funds otherwise recovered, plus $50,000.00 in punitive damages against Kahler, his wife, and the Debtor corporation. The corporate debt is alleged to be nondischargeable under 11 U.S.C. § 523(a)(4). Finally, Plaintiff seeks to compel The Western National Bank of Colorado Springs and Berniger to return the funds they received from the Debtor on the theory that the $18,861.03 and the $5,000.00 are also traceable proceeds of the $61,628.03 trust.

Plaintiff's trust argument is based on the theory that an express trust arose in this case under § 38–22–127(1), C.R.S.1973. It asserts that the trust can be enforced by the owner of real property that is or may be subject to a mechanic's lien. The statute provides as follows:

(1) All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, material suppliers, or laborers who have furnished materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

(2) This section shall not be construed so as to require any such contractor or subcontractor to hold in trust any funds which have been disbursed to him for any subcontractor, material supplier, or laborer who claims a lien against the property or claims against a principal and surety

who has furnished a bond under the provisions of this article if such contractor or subcontractor has a good faith belief that such lien or claim is not valid or if such contractor or subcontractor, in good faith, claims a setoff, to the extent of such setoff.

(3) If the contractor or subcontractor has furnished a performance or payment bond or if the owner of the property has executed a written release to the contractor or subcontractor, he need not furnish any such bond or hold such payments or disbursements as trust funds, and the provisions of this section shall not apply.

(4) Every contractor or subcontractor shall maintain separate records of account for each project or contract, but nothing contained in this section shall be construed as requiring a contractor or subcontractor to deposit trust funds from a single project in a separate bank account solely for that project so long as trust funds are not expended in a manner prohibited by this section.

(5) Any person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18–4–401, C.R.S.1973.

Courts are not in agreement on whether mechanic's lien statutes and trust lien statutes create express trusts that are enforceable by property owners. Each decision is based, at least in part, on the language of the state statute. In *Matter of Dloogoff*, 600 F.2d 166 (8th Cir. 1979), it was held that Nebraska's lien law did not create an express trust for dischargeability purposes. The Fifth Circuit has reached a similar result under Louisiana law. *Matter of Angelle*, 610 F.2d 1335 (5th Cir. 1980); *accord, In re Neal*, 3 B.R. 330 (B.C.D.Utah 1980) (construing Utah law). However, the Fifth Circuit reached precisely the opposite conclusion in *Carey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir. 1980), based on Oklahoma's mechanic's lien statute. In *Matter of Kawczynski*, 442 F.Supp. 413 (W.D.N.Y. 1977), the court construed the New York lien law to create an express trust in favor of subcontractors. The factors that persuaded the court in *Kawczynski* included

the "unambiguous statutory language" imposing the trust, the clear delineation of the trust *res,* and the imposition on the contractor-trustee of "extensive affirmative duties" in managing the trust, including the requirements of keeping detailed records and segregating the trust funds. Furthermore, it was noted that the contractor's failure to turn over the trust funds to the beneficiaries was made a larceny by the statute. The trust relationship was imposed by the statute at the time he received money from the owner, regardless of whether there existed any trust beneficiaries at the time. Hence, the trust existed prior to the contractor's misappropriation, consistent with an express, as opposed to a constructive, trust. Finally, the Tenth Circuit Court of Appeals has construed New Mexico law and concluded that it creates a fiduciary relationship based on an express trust that can be asserted by a property owner in a dischargeability action. *In re Romero,* 535 F.2d 618 (10th Cir. 1976). In *Romero,* the ruling was based on a statutory provision for the revocation of a contractor's license as a penalty for diversion of funds received for completion of a specific contract.

*Romero* and *Kawczynski* represent the better rule given the wording of the Colorado statute. Section 38–22–127 is unambiguous in its creation of a trust relationship. The corpus of the trust is unmistakably defined. Every contractor is required to maintain separate records of account for each project. Violation of the statute constitutes the crime of theft. It is of no moment that the property owner seeks to enforce the trust rather than a subcontractor. *See* Scott, *Trusts* § 126.1 (3rd ed. 1967). The property owner clearly faces potential double payment. The subcontractor is protected by the mechanic's lien statute itself, §§ 38–22–101 *et seq.,* C.R.S.1973. Thus, it is the property owner who is the principal beneficiary of the statutory trust.

Three arguments advanced by the Defendants must be addressed. First, it is

contended that § 38–22–127(2) exempts the Debtor from the obligation to hold the $61,268.03 in trust because Kahler had a good-faith belief that Avery's lien or claim was not valid or that there was a right of setoff against Avery. Based on the evidence, the Court cannot find that Kahler had such a belief. Kahler's testimony that he formed the legal opinion that the provision of sanding gravel to a mine was not lienable under the Colorado mechanic's lien statute implies a level of sophisticated legal analysis beyond Mr. Kahler's ability. As for the existence of a right of offset, it is true that the Debtor has asserted claims against Avery for negligence and breach of contract. There is absolutely no evidence that Kahler thought he had any claim against Avery until the third-party complaint was filed on March 27, 1981, over four months after the Chapter 11 petition had been filed and one month after Climax sued the Debtor. Kahler's testimony clearly shows that the only "legal" reason for his decision not to pay Avery was his counsel's opinion that the payment would be a voidable preference. Furthermore, Debtor's bankruptcy schedules filed on December 12, 1980, listed various claims of creditors as disputed. Avery's was not. Indeed, the precise amount of the debt, $54,949.13, was scheduled.

■ Defendants next argue that no trust arises in this case because Avery failed to perfect its lien under the statute, §§ 38–22–101 et seq., C.R.S.1973. Avery's lien statement was filed on Section 11 of Township 8 South, Range 79 West, 6th P.M., Lake County, Colorado. The evidence was that the gravel was delivered by Avery, stored, and used in Sections 12, 13, and 1. Since none of the gravel served to improve or maintain property located in Section 11, where the lien was filed, Defendants contend that no express trust arises under § 127. The argument is simply that Avery is not a subcontractor who has or "may have a lien, against the property," as required by § 127(1). It is improbable that Avery's failure to file on the precise sections of land where the gravel was used would render its lien void under Colorado law. The cases suggest that the operation

at Climax should be viewed as a single unit for purposes of filing a mechanic's lien. *First National Bank in Fort Collins v. Sam McClure & Son, Inc.*, 163 Colo. 473, 431 P.2d 460 (1967). The evidence additionally shows that all of the gravel had to be transported over Section 11 in order to be incorporated into the open pit mine. Section 11 would thus be property lienable pursuant to § 38–22–103 in that so much of the land necessary for the convenient use and occupation of the improvement is subject to the lien.

■ Defendants' final argument that no express trust arose in this case is that the provision of sanding gravel to a mine is not the kind of improvement for which a lien can be asserted in Colorado. The mining lien provision is found at § 38–22–104. It states:

> The provisions of this article shall apply to all persons who do work or furnish materials, or mining, milling, or other machinery or other fixtures, as provided in section 38–22–101, for the working, preservation, prospecting, or development of any mine, lode, or mining claim or deposit yielding metals or minerals of any kind, or for the working, preservation, or development of any such mine, lode, or deposit, in search of any such metals or minerals; and to all persons who do work upon or furnish materials, mining, milling, and other machinery or other fixtures, as provided in section 38–22–101, upon, in, or for any shaft, tunnel, mill, or tunnel site, incline, adit, drift, or any draining or other improvement of or upon any such mine, lode, deposit, or tunnel site; and to every miner or other person who does work upon or furnishes any coal, power, provisions, timber, powder, rope, nails, candles, fuse, caps, rails, spikes, or iron, or other materials whatever, as provided in section 38–22–101, upon any mine, lode, deposit, mill, or tunnel site.

The gravel supplied by Avery clearly falls under the category of "materials for the working and preservation of a mine," and

Avery clearly "furnished provisions to a mine." In *International Trust Co. v. Lowe*, 66 Colo. 131, 180 P. 579 (1919), the Colorado Supreme Court stated: "It is settled law that the work for which a lien on a mine is given is that which is performed in the development and conservation of the mine, and the results of which become incorporated with the mine so as to constitute a part of its value." The sanding gravel provided by Avery was part of the development and conservation of the Climax mine and contributed to its value. The mining lien is broader than the general lien statute in that items consumed in development are lienable as they contribute to the development of the mine.

Climax has argued that even if the $61,628.03 check it issued to the Debtor was not held in a statutory trust, $54,949.13 was held in constructive trust pursuant to the common law, since this amount ought to have been paid over to Avery. It has been determined that a statutory trust arose in this case. However, Plaintiff's constructive trust theory is also well taken and can serve equally well as a basis for the tracing Climax is attempting herein.

A constructive trust is an equitable remedy devised to prevent unjust enrichment and compel restitution of property that in equity and good conscience does not belong to the Defendant. It does not require an intent to create a trust. Dobbs, *Remedies*, § 5.3 at 240 (1973 ed.). Neither actual fraud, nor the existence of a fiduciary relationship need be shown. *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979); *Weeks v. Esch*, 39 Colo.App. 428, 568 P.2d 494 (1977). However, something more than a mere creditor-debtor relationship must be proved. *In re Penn-Dixie Steel Corp.*, 6 B.R. 817 (B.S.D.N.Y.1980). There must be a relationship of trust and confidence between the parties. In Colorado, a confidential relationship arises when one party has justifiably reposed confidence in another. This can occur in numerous ways, but the linchpin is that the transferor of property must be justified in his belief that the transferee will act in his best interests. *Page v. Clark, supra.*

The relationship between Climax and the Debtor was confidential. As transferor of the $61,628.03 check, Climax was entitled to expect that the Debtor would carry out its legal and contractual obligation to remit to Avery $54,949.13, thus protecting Climax from any claim by Avery. This is more than a mere creditor-debtor relationship.

The next question which follows is to what extent The Western National Bank of Colorado Springs and Berniger are liable to make restitution of trust proceeds in their possession. The proceeds of a trust, express or constructive, can be traced into the hands of third parties and recovered by the rightful claimant. However, the proceeds must be specifically identifiable as being part or product of the trust *res*. Furthermore, to the extent that trust proceeds fall into the hands of a bona fide purchaser for value, the rightful owner cannot recover the property. The Court must determine whether the Bank and Berniger knew, or should have known, of the existence of the trust relationship. Dobbs, *Remedies*, § 5.16 at 423–30 (1973 ed.); *Colorado v. Benjamin, et al.*, 41 Colo.App. 520, 587 P.2d 1207 (1978); *Coriell v. Hudson*, 563 F.2d 978 (10th Cir. 1977).

The Western National Bank of Colorado Springs used the deposit to satisfy the overdraft plus interest. The loan officer, Marc Millison, was aware of the overdraft and was closely monitoring the status of the account, the outstanding loan, and the Debtor's business itself. Millison was aware of the Climax contract with Specialized and of the subcontract with Avery. Copies of both agreements were in his possession. His credit memoranda to the Bank's file make various references to the gravel contract and proceeds thereof that the Bank expected to have deposited in the Debtor's general account. Millison testified at one point that he thought one $9,500.00 account receivable from Climax was the Debtor's "net" from the subcontract. This suggests that Millison was actually aware of the trust situation. At another point, he denied actual knowledge of the trust rela-

tionship and stated he had not read the subcontract carefully. Whichever the case may be, the conclusion is inescapable that the Bank either knew, or should have known, of the trust. It had in its possession all the information necessary to learn of it plus ample opportunity to query the Debtor during any of the numerous conversations between Millison and Kahler. That the Bank was on inquiry notice of the wrongful nature of the $18,861.03 cashier's check is likewise undeniable. Millison testified at the deposition that by November, the bulk of Debtor's cash flow was coming from the Climax gravel contract. When the check was deposited by Kahler, Millison was "intrigued" that it was in the form of a cashier's check drawn on an out-of-town bank. In fact, he thought the check interesting enough to cause a xerox thereof to be placed in the Debtor's credit file. He admitted that the check represented a significant and unusually large sum. The Bank was clearly on notice of the true nature of the deposit. Thus, it is not a bona fide purchaser and must restore the $18,861.03 to the Plaintiff.

 A different result obtains for Berniger, Berg & Sterling. The Court is convinced that Berniger knew of the relationship between the three entities, Climax, Avery, and the Debtor, at the time it received the $5,000.00 retainer on November 24. Kahler testified in his deposition that he informed Berniger that he had a check coming from Climax. Notes taken by Mr. Berniger at the November 20 meeting indicate an account receivable in the amount of $61,000.00 with $54,000.00 owed. However, Berniger testified that he was more concerned with the Debtor's immediate problem with Schmidt-Tiago and that he did not concern himself with the terms of the contracts between Climax, Avery, and the Debtor. Mr. Berniger cannot escape understanding with such ease. All of the facts were before him, and his advice to his client was hasty and without careful analysis. Even though Berniger is chargeable with notice of the trust relationship, Plaintiff has failed to show that any of the $5,000.00 received as a retainer is still available and

identifiable. Tracing is only allowed with respect to money when the fund is shown to be intact. If it has been dissipated, there is nothing to recover, and this is so even when the transferee knew all about the trust. *In re Dexter Buick-GMC Truck Co.*, 2 B.R. 247 (B.R.I.1980). The funds were placed in the firm trust account, and as fees were earned, funds were withdrawn and used for general firm purposes. Because there is no evidence that the $5,000.00 the firm received is still available, judgment must enter in favor of Berniger, Berg & Sterling.

 The claims against Dorothy Kahler and Schmidt-Tiago were dismissed upon their motions at the close of Plaintiff's case. The complaint seeks judgment against Mr. Kahler in the amount of $54,-949.13, less any trust funds received, plus exemplary damages. It is clear that Kahler is liable. He is the President of the corporation and controls it. He was as well the principal actor in the breach of trust. By diverting Climax's $61,628.03, he was able to avoid substantial personal liability to the Internal Revenue Service for withholding taxes he had failed to remit. Kahler admitted under oath that he was concerned about the legality of his acts. He was very aware of his personal liability to the I.R.S. That he breached his fiduciary duty to Climax and Avery is clear. However, the evidence falls short of that required to sustain an award of punitive damages. A breach of trust is not necessarily tantamount to a wanton and reckless disregard of the rights of others as this case shows. Section 13–21–102, C.R.S.1973. Hence, no exemplary damages will be awarded.

 Finally, the complaint seeks judgment against the Debtor for the breach of trust committed by Kahler. In addition, Climax asserts that said judgment should be made nondischargeable pursuant to 11 U.S.C. § 1141(d)(3) and 523(a)(4). Section 523(a)(4) excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity. The case law is clear that a constructive trust cannot be the basis for a finding of nondischargeability under

§ 523(a)(4). A constructive trustee is not necessarily a fiduciary. *Page v. Clark, supra.* The trust relation must arise prior to the defalcation, not as a result of it. *In re Romero, supra.* Here the conditions of the *Romero* case are met.

■ The Debtor clearly committed a defalcation while acting as a fiduciary. The debt owed Climax is nondischargeable pursuant to the provisions of 11 U.S.C. § 1141(d)(3) but, of course, is subject to the other provisions of Chapter 11 in the event the debtor achieves confirmation of a nonliquidating plan and continues in business.

DONE at Denver in said District this 16th day of July, 1981.