In re Fred H. ANZMAN, aka Fred Howard Anzman and Fred Anzman, Individually and as General Partner of F & A Associates, a Colorado General Partnership, Sole Shareholder, Officer and Director of F.H. Anzman and Associates, Professional Corporation; Shareholder, Officer and Director of Interstate Tire Warehouse, Inc., a Colorado Corporation, Debtor.

The ARMSTRONG RUBBER
COMPANY, Plaintiff,

v.

Fred H. ANZMAN, Defendant.

Bankruptcy No. 85 B 01282 G.
Adv. No. 85 C 0384.

United States Bankruptcy Court,
D. Colorado.

Feb. 13, 1986.

Deanna E. Hickman, Denver, Colo., for plaintiff.

Leslie S. Klein, Denver, Colo., for defendant.

## FINDINGS, CONCLUSIONS AND ORDER ON COMPLAINT

PATRICIA ANN CLARK, Bankruptcy Judge.

In this adversary proceeding, the plaintiff Armstrong Rubber Company (Armstrong) seeks an exception to discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6). Armstrong asserts that the debt owed to it by debtor Fred H. Anzman is non-dischargeable because it was fraudulently procured by the making of a false financial statement and fraudulently extended by the failure to inform Armstrong of both his own and his company's decline in financial condition. Additionally, Armstrong contends that Anzman, during the liquidation of his company, committed defalcation while acting in a fiduciary capacity and converted funds by permitting depletion of assets and by accepting compensation without first making provisions for creditors. At the time of trial, Armstrong withdrew its claims for relief under 11 U.S.C. § 727(a)(2)(A), (a)(3) and (a)(4)(A).

Anzman's answer, in addition to denying all Armstrong's material allegations, affirmatively asserted that Armstrong did not rely on his financial statement and that, in any event, his actions did not proximately cause Armstrong's loss.

A trial was held on December 31, 1985. Based upon the documentary evidence and the testimony of various witnesses, including the deposition of James A. Cole, former Regional Credit Manager for Armstrong, and testimony of Warner Knobe, former official of the Aurora Bank by transcript and exhibits, the Court finds the following facts.

Anzman, a certified public accountant, performed accounting services for various Denver businesses. One such business was Interstate Tire Warehouse (Interstate). As a result of this work for Interstate, Anzman became acquainted with its owners, Gerald Kessel, Sherman Burry and Albert Stone. In 1983, Anzman, along with Michael Finesilver, began negotiations with

Kessel, Burry and Stone regarding the purchase of Interstate.

Neither Anzman nor Finesilver had prior experience in operating a tire business. Anzman's involvement in the business had been limited to the auditing of Interstate's books and records. Finesilver, a real estate agent, had no previous exposure to the industry. Further, during its 1983 fiscal year, Interstate had experienced an operating loss of which both Anzman and Finesilver were aware. Nevertheless, the negotiations culminated in a stock purchase agreement executed on June 16, 1983.

Performance of this agreement by stockholders [1] was expressly contingent upon the release of any personal liability of stockholders of any debts owing to four suppliers, one of which was Armstrong. The three former owners, along with each of their wives, had personally guaranteed payment of any credit extended to Interstate by Armstrong. By the terms of the agreement, the satisfaction of this contingency could be waived by the stockholders.

When the stock purchase agreement was executed, this contingency had not yet been satisfied. In a letter dated June 16, 1983, Anzman and Finesilver informed Kessel, Burry and Stone of their inability to obtain a release of the guarantees. Accordingly, Anzman and Finesilver agreed by letter dated May 16, 1983 as promptly as practical to use their best efforts to obtain the release of these obligations following the closing of the purchase of stock.

Shortly after the stock purchase agreement was signed, counsel for Kessel, Burry and Stone wrote to Fred Campbell, Director of Credit at Armstrong. The letter informed Campbell that Kessel, Burry and Stone withdrew their personal guarantees of any indebtedness incurred by Interstate subsequent to June 22, 1983. The letter also stated it was "our understanding that Messrs. Finesilver and Anzman are forwarding their personal financial statements to you for the purpose of substituting their individual guarantees for the guarantees of Messrs. Kessel, Stone and Burry."

Fred Campbell received further communications concerning the release of these guarantees. In a letter dated July 6, 1983, Marshall Fishman, counsel for Interstate, Anzman and Finesilver, requested that "the personal guarantees of Messrs. Kessel, Burry and Stone be released and in lieu thereof, the personal guarantees of Messrs. Anzman and Finesilver be substituted therefor." Mr. Fishman also stated that he was enclosing the financial statements of Anzman and Finesilver in the hope of expediting the decision on the release.

Prior to receipt of Mr. Fishman's letter and Anzman's financial statement, the guarantees were scheduled to be released. Kessel, in a discussion with Campbell, had requested the release of the guarantees. Pursuant to that conversation, Campbell agreed to the releases. On July 14, 1983, Campbell sent Kessel three copies [2] of guarantees signed by the former owners "as an original and full release of any obligation for debts incurred by Interstate Tire Warehouse as of notification date July 6, 1983." New guarantee forms to be signed by Anzman, Finesilver and their wives were included in that correspondence. Anzman signed the submitted guarantee on September 8, 1983, which Armstrong received on September 13, 1983. His wife, because of her involvement in other business, refused Armstrong's request that she also sign the guarantee.

Shortly after Anzman and Finesilver acquired Interstate, it became delinquent in its accounts with Armstrong. Because of this delinquency, and with the intent to continue doing business with Armstrong, Anzman contacted Cole to arrange a meeting to discuss payment of past due amounts. In September, 1983, James A. Cole, Regional Credit Manager for Armstrong, met with Anzman in Denver, Colorado. At this meeting they discussed the past due amounts and the possibility of continuing business on open account.

Interstate failed to bring its account with Armstrong current. Again, Anzman con-

---

**1.** The agreement defined stockholders as Kessel, Burry and Stone.

**2.** Campbell explained that he was unable to locate the original guarantees.

tacted Cole to arrange a meeting to discuss the past due amounts. On November 3, 1983, Anzman and his counsel met with Cole and Michael Fountain, treasurer of Armstrong, in New Haven, Connecticut. At that time, Armstrong agreed to accept the return of approximately $17,000 in goods for credit and to resume sales on open account once the account was brought current. A repayment schedule was agreed upon whereby Interstate was to pay $10,000 at the meeting, $15,000 by November 7, 1983 and $25,000 per month thereafter until the account was brought current.

Interstate returned the merchandise for approximately $17,000 credit, made the $10,000 and $15,000 payments, but failed to meet the $25,000 repayment schedule. Although Interstate failed to comply with the set schedule, it ultimately decreased its debt to Armstrong from approximately $222,201.71 to $58,989.83 for a total deduction of $163,211.88 through a combination of return of merchandise, adjustment credits and payments on account. From the time Anzman and Finesilver acquired Interstate, Armstrong neither extended any new credit nor shipped new merchandise to Interstate. Interstate simply paid on a debt accrued before June 16, 1983 of approximately $222,201.71.

Meeting Armstrong's repayment schedule was not the only financial obstacles Interstate encountered. Interstate was also having difficulty making payments on its line of credit to First Interstate Commercial Credit (FICC), its major lender. Eventually, after periodic reductions in available credit, FICC terminated its credit line to Interstate in March, 1984. In the spring of 1984, due to the loss of the line of credit and other financial difficulties, Interstate terminated business and went into liquidation posture. Anzman attributed the company's difficulties in part to Finesilver's inability to work with Kessel, who was to consult with him until he learned the tire business. Instead, Kessel terminated the relationship within a few weeks

of the acquisition of Interstate by Anzman and Finesilver. Anzman also believed that the company's financial problems were further exascerbated by Finesilver's refusal to lower prices to become more competitive in the Denver market.[3]

Interstate's financial problems throughout the entire tenure of the new owners were reflected in documents submitted or available to Armstrong. For example, Anzman, in a letter to Fountain dated October 7, 1983, discussed Interstate's consolidated financial statement for the fiscal year ending August 31, 1983 which reflected an adjusted loss of $24,611. Later Anzman submitted a new personal financial statement dated May 31, 1984 which contained additional contingent liabilities and reflected his impaired financial condition.

In the present case, the Court must decide whether the requirements of any of the four subsections of 11 U.S.C. § 523 on which Armstrong bases its complaint have been met. Because the thrust of the Armstrong complaint and the proof at trial concern Anzman's financial statement which Armstrong alleges it relied on in its decision making, the Court will begin with Section 523(a)(2)(B).

Section 523(a)(2)(B) provides in pertinent part:

(a) A discharge under Section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

. . . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such ... property, ... reasonably relied; and

the United States."

---

**3.** According to Cole, the Denver tire market is one of the most "fiercely competitive markets in

(iv) that the debtor caused to be made or published with intent to deceive.

In order to come within the purview of this section, Armstrong must prove that the debtor indeed obtained money, property or a renewal or refinancing of credit. The threshold question then is whether Anzman can be held personally liable for debts incurred prior to his acquisition of Interstate and, if so, whether an extension of time to repay that debt constituted an extension of credit under Section 523(a)(2)(B). Armstrong argues that Anzman became personally liable for all Interstate's debts due Armstrong because he "substituted" his guarantee for those of former owners Kessel, Burry and Stone. Thus, Armstrong contends, a novation occurred and Anzman "stepped into the shoes" of the previous guarantors.

■ A novation is defined as a substitution of a new contract between the same or different parties. *Lampley v. Celebrity Homes, Inc.*, 42 Colo.App. 359, 594 P.2d 605 (1979). The requisites of a novation are a previous valid obligation, an agreement of all the parties to the new contract, consideration, extinguishment of the old obligation, and the validity of the new one. *Lampley*, 694 P.2d at 607. The pre-existing obligation must be extinguished or there is not a novation. *Richardson Drug Co. v. Dunagen*, 8 Colo.App. 308, 46 P. 227 (1896).

Here, Kessel, Burry and Stone's guarantees were not extinguished by Anzman's new guarantee submitted to Armstrong on September 8, 1983. The document itself indicates that Anzman's obligation was for prospective debts only. The guarantee provides, in pertinent part:

In consideration of the credit THE ARMSTRONG RUBBER COMPANY (hereinafter referred to as Armstrong), *may hereafter extend* to Interstate Tire Warehouse, Inc., ... (hereinafter referred to as Customer), the undersigned does hereby unconditionally guarantee the payment when due of any and all indebtedness *incurred by Customer* to Armstrong, including interest thereon, regardless of the form of the indebtedness, including but not limited to, open account, promissory note or otherwise, and all extensions and renewals thereof and agrees to pay all costs and reasonable attorneys' fees incurred in collecting the same or in enforcing this guarantee. The undersigned further guarantees the performance by Customer of all contracts entered into between Customer and Armstrong. (Emphasis added.)

The crucial phrases in this paragraph, which refer to credit "hereafter" extended and to all indebtedness "incurred" (not which has been incurred) mandate only one conclusion—that the guarantee covers only prospective obligations. Construing this document against its drafter, Armstrong, *Christmas v. Cooley*, 158 Colo. 297, 406 P.2d 333 (1965), this Court finds that the guarantee, as written, does not constitute a novation and does not render Anzman liable for Interstate's debts incurred prior to September 8, 1983.

Additional evidence submitted by Armstrong itself suggests that the parties involved intended that the guarantee apply only to prospective debts. As previously discussed, counsel for Kessel, Burry and Stone informed Armstrong that his clients wished to withdraw their personal guarantee of indebtedness incurred subsequent to June 22, 1983. Further, when the former owners' guarantees were released, the release was for any debts incurred by Interstate as of July 6, 1983. It is difficult to interpret these statements as evidencing an intent to have the new guarantees apply retrospectively.

Therefore, under Anzman's guarantee, he became personally liable for debts incurred after September 8, 1983. Because no new credit was extended or additional merchandise shipped after that date, or, for that matter, after Anzman and Finesilver acquired Interstate, Anzman did not become personally liable for any of Interstate's indebtedness.

■ Even if Armstrong had met the initial requirement of Section 523(a)(2)(B), it must still show that:

(1) the financial statement was in writing;

(2) the statement concerned the debtor's financial condition;

(3) the statement was materially false;

(4) the debtor caused to be made or published the statement with intent to deceive; and

(5) the creditor reasonably relied upon the statement. *In re Blatz*, 37 B.R. 401 (Bankr.E.D.Wis.1984). The plaintiff must also show that the creditor sustained the alleged loss and damage as a proximate result of the debtor's financial statement having been published. *In re Garman*, 643 F.2d 1252 (7th Cir.1980), *cert denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). Each element of Section 523(a)(2)(B) must be established by clear and convincing evidence. *Brown v. Buchanan*, 419 F.Supp. 199 (E.D.Va.1975).

■ As to the first two elements, Anzman admits that he prepared the typed and signed personal financial statement presented to Armstrong. In order to meet the third element of material falsity, the statement must contain not only incorrect or erroneous information, but must be substantially inaccurate. *In re Denenberg*, 37 B.R. 267 (Bankr.D.Mass.1983). Material falsity in a financial statement can be premised upon inclusion of false information or upon the omission of information about a debtor's financial condition. A financial statement which misrepresents the debtor's ownership of an asset or which does not disclose the true ownership of assets included within the debtor's property is materially false. *In re Winfree*, 34 B.R. 879, 884 (Bankr.M.D.Tenn.1983).

A review of Anzman's financial statement dated June 21, 1983 reveals a number of overstatements and omissions. First, as an asset, Anzman listed a $120,000 balance in bank accounts. The testimony disclosed that on June 21, 1983, Anzman had three accounts at the Aurora bank and none at any other bank. The first, a joint account with his wife, had a $1,421.57 balance on that date. A second joint account with his wife had an $84,799.59 balance. The third

account, one for Anzman, Rose and Assoc., P.C., had a balance of $3,011.50. Other entries on the financial statement reflect the total value of jointly owned assets without disclosing the fact of joint ownership. For example, Anzman admitted that real estate, valued at $145,000, and personal and household items, valued at $100,000, were jointly owned although no indicia of such joint ownership appeared on the statement. Further, Anzman listed a $350,000 stock ownership interest in 77 Oxford Corporation. At the trial Anzman admitted the stock was solely owned by his wife.

Additionally, Anzman offers little substantiation for the valuation of his interest in Interstate and in his accounting firm. The stock purchase agreement of June 16, 1983 allocated $70,000 of the total purchase price of Interstate to its stock. Yet, on June 21, 1983, Anzman valued his 50 percent interest in that stock at $500,000. As to his accounting firm, Fred H. Anzman and Assoc., P.C., C.P.A., Anzman placed a $350,000 value on the practice. At the trial an expert testified that the "high value" of the firm would have been $230,000 with the "low value" being $148,000. While examination of the expert indicated that additional factors such as a pension plan or a particular type of client would affect the value, Anzman did not convince the Court that such factors significantly affected the valuation of his firm.

Finally, Anzman's statement failed to include his obligations as guarantor or cosignor on four transactions. He had guaranteed a line of credit of $45,000 to his accounting practice, was co-signor on a note to the former owners of Interstate in the amount of $370,000 and had guaranteed debts totaling $343,000 to 77 Oxford Corporation and debts totaling $731,000 to FICC.

■ The Court finds Anzman's June 21, 1983 personal financial statement substantially inaccurate and holds that the third element, material falsity, has been met. Further, based on the overstatements and omissions in that statement, while taking into consideration the debtor's business experience, it would strain credulity to find that Anzman did not know or

should not have known that the information presented by him was false. Therefore, the fourth element—intent to deceive—may be inferred from these false representations. *See In re Blatz,* 37 B.R. 401, 404 (Bankr.E.D.Wisc.1984); *Matter of Garman,* 643 F.2d 1252 (7th Cir.1980), *cert denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).

■ As a fifth factor, Armstrong must prove that it actually relied upon Anzman's false financial statement and that such reliance was reasonable. To establish reliance, the creditor must show that its reliance on the false financial statement was "a contributory cause of the extension of credit" and "that credit would not have been granted if the lender had received accurate information." *In re Coughlin,* 27 B.R. 632, 637 (B.A.P. 1st Cir.1983). In the instant case Armstrong has failed to establish that it actually relied on Anzman's personal financial statement. Testimony from Cole indicates that the most determinative factor in credit decisions was Interstate's business financial statement. Further, Armstrong's representatives admitted that it wished to continue selling merchandise to Interstate and that it was in the company's best interest to resolve Interstate's credit problems. Clearly Armstrong benefitted from the ongoing payments made by Interstate. Accordingly, this Court finds that Armstrong made its credit decisions for its own purposes, rather than on the strength of the income or assets found on Anzman's financial statement. As a result, it cannot be said that Armstrong proved actual reliance by clear and convincing evidence.

■ Even if Armstrong actually relied upon Anzman's financial statement, it must also prove that such reliance was reasonable. To sustain its burden of demonstrating reasonableness a lender must show it exercised ordinary diligence with respect to the loan. *In re Denenberg,* 37 B.R. at 272. When a creditor chooses to ignore what have been termed "red flags" concerning a financial statement, there is no clear and convincing evidence of reasonableness. *In re Simpson,* 29 B.R. 202 (Bankr.N.D.Iowa 1983). Where there is some reason to be suspicious of debtor's information, a creditor has a duty to investigate beyond the financial statements. *In re Schade,* 10 B.R. 115 (Bankr.N.D.Ill. 1981). *Compare In re Breen,* 13 B.R. 965 (Bankr.S.D.Ohio 1981) (which suggests that the creditor has an affirmative duty to investigate even without "warning signs").

■ The dispositive factor in this case is that Armstrong ignored warning signs indicating that Anzman's financial statement was inaccurate or incomplete while making little or no attempt to investigate the document. There were at least five "red flags" which should have alerted Armstrong to problems in Anzman's statement. First, Anzman, although married, listed no assets owned jointly and listed his residence, along with cash in bank accounts, as solely owned by him. Although this Court is not presuming that all real estate, cash in banks and other assets are jointly owned simply because one is married, the fact that Armstrong knew Anzman was married, along with the fact that assets in many marriages are jointly held, should have alerted Armstrong to inquire into the ownership status of the assets listed.

Further, Armstrong was aware that Interstate worked with FICC as its major lender and that Interstate was indebted to FICC. Yet, it failed to question the absence of any personal guarantee to FICC. Armstrong had found it necessary to require that Anzman sign a personal guarantee for Interstate's debts to Armstrong. Prudence should have dictated that the lack of guarantee to FICC on the financial statement be questioned.

Additionally, the circumstances surrounding the change in ownership should have alerted Armstrong that a careful investigation of Anzman's statement was required. Cole pointed out that Denver has one of the most competitive tire markets in the nation. Cole also questioned Anzman and Finesilver's ability to survive in this competition because of their lack of experience in the market, Anzman being an accountant and Finesilver a real estate agent. Further, Armstrong, by October 7, 1983,

was alerted to Interstate's deteriorating financial status and was aware that Interstate was delinquent in payment on its account. These factors alone would not be "red flags" but combined with other indications, should have put Armstrong on notice that, at the very least, it must proceed with caution and circumspection. Before agreeing to repayment schedules in November, 1983, Armstrong had a duty to investigate Anzman's financial statement.

■ The testimony of Armstrong's representatives indicates that little or no investigation into Anzman's finances ever occurred. No one checked Anzman's bank account status or even looked at his real estate titles. Apparently even the normal computer credit check was not performed. This Court cannot find reasonable reliance when, in light of the surrounding circumstances, Armstrong ignored available information or failed to seek information from sources that are commonly used. Armstrong has failed to meet its burden of proof of reasonable reliance under Section 523(a)(2)(B).

■ In addition to its failure to prove actual and reasonable reliance, Armstrong has failed to show that it sustained any loss as a proximate result of Anzman's financial statement. Unless a creditor has advanced "fresh cash" to the debtor or had foregone some other remedy such as garnishment or foreclosure in reliance on a misrepresentation, the debt is not barred under Section 523(a)(2)(B). *In re Chambers*, 23 B.R. 206 (Bankr.W.D.Wis.1982). As the court in *Chambers* pointed out, the reasoning behind this doctrine is that a creditor is only damaged by a false statement to the extent that he advances money or foregoes a remedy in reliance on the false statement. *Chambers*, 23 B.R. at 209. Armstrong has not persuaded this Court that any reliance it may have made upon the false financial statement was detrimental to Armstrong. Armstrong did not make a decision to forebear planned judicial proceedings [4] or to modify its rights

when the repayment schedule was agreed upon. To the contrary, testimony indicates that Armstrong also accepted payments of overdue debts from other customers and also indicated that it was in Armstrong's interest to allow Interstate to continue payment of its overdue debt in order to re-establish an open account. Therefore, this Court finds that Armstrong has failed to prove its case under Section 523(a)(2)(B).

Armstrong also challenges the discharge of its claims under Section 523(a)(2)(A), alleging that Anzman obtained an extension of credit through false pretenses, false representation or actual fraud. Armstrong contends that Anzman fraudulently concealed his financial status and Interstate's financial straits when negotiating for extended payment terms. It argues that Anzman obtained these payment terms knowing that Interstate would be unable to comply and, thus, the debt should be discharged.

■ The Bankruptcy Act does not define the terms false pretenses, false representations or fraud, but instead relies upon the common law interpretations of these concepts. To present a prima facie case of false pretenses, false representations or fraud in this jurisdiction, a claimant must show, among other things, that he relied on representations made by the debtor. *In re Garman*, 643 F.2d 1252 (7th Cir.1980). By way of decisional law, the bankruptcy courts have incorporated the duty of ordinary care into the concept of reliance under Section 523(a)(2)(A). The crux of the inquiry is whether the reliance, given the creditor's position and the character of the debtor's misrepresentation, was so unreasonable as to be no reliance at all. *See In re Saunders*, 37 B.R. 766 (Bankr.N.D.Ohio 1984).

■ In this case Armstrong had ample opportunity to investigate Interstate's financial status and, in fact, was put on notice as to Interstate's financial problems, albeit not given details as to their extent.

---

**4.** Armstrong's representatives testified that it had the "ability" to institute a suit but did not prove convincingly to this Court that it detrimentally relied on the financial statement by forebearing suit.

Even the simplest of inquiries would have revealed Interstate's financial problems. The same inquiries, as previously discussed, would have revealed Anzman's financial condition. Given the circumstances surrounding the extension of credit and considering the fact that Armstrong clearly had notice of Interstate's decline, Armstrong had a duty of ordinary care to conduct an inquiry. Armstrong cannot now complain of Anzman's false representations, since with the exercise of a minimum of diligence, it would have discovered the errors and omissions on the financial statement.

In addition to the reliance factor, proof of a claim under Section 523(a)(2)(A) is substantially similar to proof under Section 523(a)(2)(B). *See In re Hunt*, 30 B.R. 425, 435 (M.D.Tenn.1983) (listing the five elements to prove a case under Section 523(a)(2)(A)). Specifically, creditor must prove, among other things, that as a proximate result of false representations, it sustained damage and loss. As previously discussed, Armstrong has failed to prove any detrimental reliance on Anzman's representations. Therefore, Armstrong's claim under Section 523(a)(2)(A) must fail.

■ Because Anzman's debt is dischargeable under Section 523(a)(2)(A) and (B), the Court must determine whether the requirements of Sections 523(a)(4) or 523(a)(6) are met. For a debt to be non-dischargeable under Section 523(a)(4), the plaintiff must prove that the debtor committed fraud or defalcation while acting in a fiduciary capacity.[5] In order to prove that a debt is non-dischargeable under this section, the debt alleged to be non-dischargeable must arise from a breach of trust obligations imposed by law, separate and distinct from any breach of contract. *In re Johnson*, 691 F.2d 249 (6th Cir.1982).

Armstrong asserts that the "fiduciary" capacity referred to in Section 523(a)(4) is imposed by statute, in particular Sections 7–5–110 and 7–5–114(1)(c), C.R.S. Armstrong contends that during the liquidation of assets of Interstate, Anzman acted con-

trary to these Colorado Statutes in receiving money from the corporation.

Colorado has enacted legislation governing the activities of officers and directors of a corporation. *See* Article 5 entitled "Directors—Officers—Records." Section 7–5–110 governs the distribution of dividends in certain instances and Section 7–5–114(1)(c) governs the liability of directors in certain cases. According to Armstrong, these sections created a special relationship between it and Anzman, analogous to that found by other courts to give rise to a statutory trust within the purview of Section 523(a)(4).

For a variety of reasons, this Court cannot find that Armstrong has met its burden of proof under Section 523(a)(4). The first inquiry is whether the cited sections impose the requisite trust obligations. Generally, those courts which have found the requisite statutory trust under Section 523(a)(4) were dealing with statutes which expressly designated funds received as "trust funds" and imposed specific duties on those disposing of the funds. *See, e.g., In re Specialized Installers, Inc.*, 12 B.R. 546 (Bankr.D.Colo.1981) (Colorado Lien Trust Statute). Alternatively, a court has found a Section 523(a)(4) fiduciary status where a detailed state statute provides for revocation of a license if funds which were to be segregated and accounted for were diverted for other purposes. *See Allen v. Romero*, 535 F.2d 618 (10th Cir.1976). In both situations, unambiguous statutory language required performance of extensive, affirmative duties in managing the funds held in "trust" and clearly set forth the trust requirements.

■ Not every state statute which imposes a duty imposes a "trust" relationship. The elements of a formal trust or typical attributes of such a trust must exist. *Ford Motor Credit Co. v. Talcott*, 29 B.R. 874, 878 (Bankr.D.Kan.1983). The general characteristics of an express trust are sufficient words to create a trust, a definite subject, a certain object or *res*,

---

5. Although a Section 523(a)(4) claim may also be based on larceny or embezzlement, plaintiff

has not alleged that Anzman committed either one.

with intent to create the trust relationship being a key element. *In re Martin*, 35 B.R. 982, 985 (Bankr.E.D.Pa.1984).

█ In this instance, Sections 7–5–110 and 7–5–114(1)(c) do not expressly designate the funds received by the corporation as "trust funds," impose no specific duties for segregation of these funds, do not set up a specific licensing scheme providing for revocation if mandates are not followed and do not have the general characteristics of a trust. To extend the Bankruptcy Code's limited definition of fiduciary to a situation where a state statute merely creates a civil liability would be contrary to the Code's intent. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934) (the meaning of "fiduciary" in Section 523(a)(4) is an issue of federal law which limits its application to express or technical trusts). Thus, Anzman, as director of Interstate, was not made a fiduciary by Sections 7–5–110 or 7–5–114(1)(c).

█ Moreover, in order for a debt to arise from a default in a fiduciary capacity, the fiduciary duty must be owed directly to the complaining creditor. *In re Good*, 33 B.R. 163, 166 (Bankr.M.D.Fla.1983). Sections 7–5–110 and 7–5–114 concern a director's relationship with his shareholders, not with creditors.[6] Armstrong, as an unpaid creditor, cannot make a claim under Section 7–5–114(3) because the fiduciary duty, if any, is not owed directly to it. *See also Kelley v. Conwed Corp.*, 429 F.Supp. 969 (E.D.Va.1977).

Even if this Court were to find that a fiduciary duty existed and that Armstrong has standing to make a claim, Armstrong has presented no evidence supporting a finding that the duty has been breached. Armstrong's defalcation claim is based on its contention that payments received by Anzman during liquidation should have been distributed to creditors. These payments consisted of either direct salaries to Anzman as director and officer of Interstate or fees paid to Anzman's accounting firm. Armstrong has not shown that these fees were excessive or were fraudulently paid nor does it dispute the fact that Anzman did work at Interstate until the business was wound up and that his firm did provide accounting services.[7] Apparently, Armstrong is arguing that Anzman should have worked for free in winding up and liquidating the corporation while making certain that creditors were paid. Such a situation does not appear to be the intent of the Colorado statutes governing a corporation's liquidation and is clearly not a situation that was contemplated by the Bankruptcy Code. *See, e.g., In re Stevens*, 476 F.Supp. 147 (D.New Jersey 1979) (where the court held that to simply say that a corporate officer making wage and vacation payments to himself with knowledge of the corporation's insolvency is not enough to constitue misappropriation). *See also* 19 Am.Jur.2d § 1423 (stating that where a corporation makes a voluntary assignment for the benefit of creditors and no action is taken to place the assets and management of its business in the control of a receiver, such assignments do not release the company from its contract with officers to pay their salaries).

█ Finally, Armstrong contends that the debts owed it by Anzman are non-dischargeable pursuant to Section 523(a)(6). Section 523(a)(6) excepts from discharge

---

**6.** Armstrong cites *Ficor, Inc. v. McHugh*, 639 P.2d 385 (Colo.1982) for the proposition that the right to enforce Section 7–5–114(3) extends to the creditors. Armstrong's reliance on *Ficor* is misplaced. In *Ficor*, the Colorado Supreme Court stated "it does not necessarily follow that creditors can individually recover *on their own behalf* under this [Section 7–5–114(3) ] statute, and the purpose of nominally placing the remedy in the corporation rather than the creditors is to avoid that result." The court went on to hold that in order to treat all creditors equally, an action to enforce Section 7–5–114(3) could be brought by all creditors of a corporation, as a group. Such is not the case here. Armstrong is only one of many creditors of the debtor.

**7.** Anzman received a total of approximately $45,165.97 from Interstate for work performed June 21, 1983 to June 4, 1984. Based on the evidence, Anzman devoted two to three full days a week to Interstate and provided accounting services. This Court does not find that the amount paid to Anzman for such work is excessive.

any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Although unlawful conversion is not specifically mentioned in Section 523(a)(6), a debt arising from willful and malicious conversion is included within the scope of a willful and malicious injury to the property of another. 124 *Cong.Rec.* H11,096–6 (daily ed. Sept. 28, 1978). Before determining whether the defendant's conduct was sufficiently willful and malicious for the purpose of the federal non-dischargeability standard, it is appropriate to ascertain whether the defendant committed the tort of conversion under relevant state law. *In re Banister,* 737 F.2d 225 (2d Cir.), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984).

Conversion is defined as any distinct unauthorized act of dominion or ownership exercised by one person over personal property belonging to another. *Byron v. York Investment Co.,* 133 Colo. 418, 296 P.2d 742 (1956). Here, Armstrong has failed to prove by clear and convincing evidence that Anzman converted its property by receiving compensation while Interstate was liquidating its assets. Further, because the liquidation of the inventory of Interstate was subject to a first lien of FICC, FICC was the proper recipient of the liquidation proceeds. Armstrong has presented no evidence indicating Anzman received funds to which he was not entitled or allowed an improper distribution of assets.

Even if conversion had been established, a debt is dischargeable unless the conversion is "willful and malicious." In order for a conversion to be "willful," it must be deliberate and intentional. H.R. Rep. No. 595, 95th Cong., 1st Sess. 365 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6320. A "malicious" conversion may occur if it was wrongful or without just cause or excuse. 3 *Collier on Bankruptcy,* ¶ 523.14 (5th ed. 1985).

Again, Armstrong failed to meet its burden in establishing willful or malicious conduct. No evidence indicated that Anzman knew that his act of receiving compensation or proceeding with liqui-

dation was in contravention of Armstrong's rights or that he proceeded deliberately and intentionally in the face of that knowledge. Without such evidence, this Court cannot find that Anzman willfully and maliciously converted money during the liquidation of Interstate.

ORDERED that the debt of Fred H. Anzman is dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B), 523(a)(4) and 523(a)(6).

FURTHER ORDERED that the parties shall have 10 days from the date this Order becomes final to file a written request for the withdrawal of all exhibits received in evidence, after which time the exhibits will be destroyed by the Clerk without further order of the Court.