In re Betty E. GREENE aka Betty Smith, Debtor.

CREDITHRIFT OF AMERICA, Plaintiff,

v.

Betty E. GREENE, aka Betty Smith, Defendant.

Bankruptcy No. B87–00671–Y. Adv. No. 87–0081.

United States Bankruptcy Court, N.D. Ohio.

April 26, 1988.

Richard G. Zellers, Youngstown, Ohio, for debtor/defendant.

Carl D. Rafoth, Youngstown, Ohio, trustee.

Robert W. Bannon, Youngstown, Ohio, for plaintiff.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This is an action seeking the Court's determination that an obligation of Debtor is not dischargeable pursuant to 11 U.S.C. Sec. 523(a)(2)(B). This is a core proceeding pursuant to 28 U.S.C. Sec. 157(b)(2)(I).

On June 6, 1985, the Debtor applied for a Four Thousand & 00/100–Dollar ($4,000.00) loan with CREDITHRIFT OF AMERICA ("CTA") in order to consolidate payments on a number of credit or charge accounts on which she was obligated. A loan in the principal amount of Three Thousand, One Hundred Twenty-Six & 21/100 Dollars ($3,126.21) was approved, and funds were disbursed on June 10, 1985.[1] The Debtor apparently made regular payments on the loan until September, 1986, when she became unemployed due to a disability. When the loan became delinquent, numerous repeated telephone calls appear to have been made to the Debtor by CTA to determine when the account would be brought current. On October 27, 1986, the Debtor agreed to refinance her obligation with CTA in order to end the repeated telephone calls from CTA. Victor Russell, an agent of CTA, questioned the Debtor over the phone and completed the loan application. It appears that the loan was approved and all loan papers were prepared the same day. The Debtor signed all the papers, including the loan application, when she went to the CTA office on October 27, 1986. The remaining balance from the original loan of Two Thousand, Six Hundred Forty & 94/100 Dollars ($2,640.94) was refinanced over a new thirty-month (30–month) term. On June 2, 1987, the Debtor filed a Voluntary Petition under Chapter 7 of Title 11 of the United States Code. This adversary action was commenced on September 8, 1987, and an evidentiary hearing was held on March 17, 1988.

11 U.S.C. Sec. 523(a)(2)(B) provides:

(a) A discharge under Sec. 727, 1141, 1228(a), 1228(b), or 1328(b) of this Title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . . .

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
(iv) that the debtor causes to be made or published with intent to deceive. . . .

The elements for non-dischargeability under Sec. 523(a)(2)(B) are:

---

1. The funds paid off outstanding accounts in full at Gimbel's, Firestone, Horne's, and Strouss (Kaufmann's), with partial payment on the account at Sears. A small remainder was paid to the Debtor.

(1) debtor made a materially false representation in writing;

(2) the false writing concerned the debtor's financial condition;

(3) the creditor relied on the representation in extending credit and the creditor's reliance on the representation was reasonable;

(4) the representation was made with the intent to deceive.

CTA is responsible for proving these elements by clear and convincing evidence. *In re Martin*, 761 F.2d 1163, 1165 (6th Cir.1985).

■ At trial, the Debtor emphasized the fact that no new value was exchanged between CTA and the Debtor upon the refinancing of the original obligation. Presumably, this argument rests on the premise that the maximum amount which can be held non-dischargeable pursuant to Sec. 523(a)(2)(B) in a refinancing arrangement is the amount of new money advanced. *See In re Wright*, 52 B.R. 27, 29 (Bankr.W.D. Pa.1985). The reasoning in *Wright* has been repudiated by some courts, resting partly upon the legislative history of Sec. 523, which reads:

In many cases, a creditor is required by state law to refinance existing credit on which there has been no default. If the creditor does not forfeit remedies or otherwise rely to his detriment on a false financial statement, with respect to existing credit, then an extension, renewal, or refinancing of credit is nondischargeable only to the extent of the new money advanced; on the other hand, if an existing loan is in default or the creditor otherwise reasonably relies to his detriment on a false financial statement with regard to an existing loan, then the entire debt is nondischargeable under Sec. 523(a)(2)(B). This codifies the reasoning expressed by the 2nd Circuit in *In re Danns*, 558 F.2d 114 (2nd Cir.1977).

H.R.Rep. No. 595, 95th Cong., 2d Sess., *reprinted in* 1978 *U.S. Code & Congressional and Administrative News*, 5787, 6453 (Statement of Rep. Edwards). In the present case, the existing loan was in default when the refinancing was consummated. This Court relies upon those decisions which hold that where a creditor has reasonably relied upon a false financial statement in refinancing an existing loan in default, the entire debt may be found to be nondischargeable, notwithstanding the absence of an advance of new money at the time of the refinancing. *In re Tomei*, 24 B.R. 204 (W.D.N.Y.1982); *In re Greenidge*, 75 B.R. 245 (Bankr.M.D.Ga.1987).

■ CTA argues that the Debtor understated her liabilities and overstated her income in the 1986 loan application. Either fact could render the application "materially false" for purposes of construing the statutory exception to discharge. *In re Anzman*, 73 B.R. 156, 163 (Bankr.D.Colo. 1986). The 1986 application listed six (6) creditors reciting a total indebtedness of Four Thousand, Four Hundred Sixty–Nine & 71/100 Dollars ($4,469.71).[2] The affidavits introduced by CTA indicate additional undisclosed debt of Four Thousand, Five Hundred Seventy–One & 30/100 Dollars ($4,571.30).[3] Katherine Virgallito, the Program Director at Consumer Credit Counseling Service who had assisted Defendant prior to her filing here, testified that the Debtor had also been obligated to American Express, Marine Midland Bank, Trumbull Credit, and Sohio in September, 1986.

Furthermore, although the application listed child support of Two Hundred & 00/100 Dollars ($200.00) a month, the Debtor testified that she had never received such payments on a regular basis. Depending on when she and her husband separated, the Debtor may have been justified in listing child support on the original 1985 application. However, after *at least* sixteen (16) months with no payment of child support, the expectation of future pay-

---

**2.** Calculations by the Court only indicate an indebtedness of $4,069.71.

**3.** Breakdown of this amount was as follows: Two accounts at Strouss (Kaufmann's)— $2,907.96; one account at Gimbels—$1,037.40; one account at J.C. Penney—$237.50; one account at Montgomery Ward—$388.44.

ments would be patently unfounded. Finally, representations which tend to overstate one's income and understate one's liabilities certainly "concern the Debtor's financial condition." Thus, the Court concludes that the 1986 loan application was materially false concerning the Debtor's financial condition, as contemplated in Sec. 523(a)(2)(B).

■■■ We must also consider whether CTA reasonably relied on the application in the renewal or refinancing of credit for Debtor. The reasonableness of a creditor's reliance normally is measured by the thoroughness of the creditor in attempting to verify the debtor's representations. *In re Tesmetges,* 74 B.R. 911 (Bankr.E.D.N.Y. 1987); *In re Constantino,* 72 B.R. 231 (Bankr.N.D.Ohio 1987). The Movant failed to produce clear and convincing evidence that a reasonable inquiry had been conducted of Debtor's financial condition at the time of the renewal. In fact, the only evidence that any verification was attempted was Mr. Russell's testimony that he had checked her employment. Mr. Russell admitted, however, that he had failed to request a Credit Bureau report, and Ms. Kerrigan could not remember whether she had done so. Although Ms. Kerrigan did testify that it was normal procedure for them to review an applicant's Credit Bureau report, the total absence of any evidence that a credit report had been considered militates strongly in favor of the Debtor. It is extremely likely CTA would have discovered some of the undisclosed obligations had they requested and reviewed a Credit Bureau report.[4] Furthermore, the completion of the application, work-up, approval, and processing of the refinancing documents in one day tends to support the conclusion that the refinancing was hastily arranged and that there was an absence of reasonable inquiry. Finally, Mr. Russell's recall of the fact that the Debtor had a good payment history suggests that CTA relied as much on this factor as on the information in the written application.[5] CTA did not bear its burden of producing clear and convincing evidence proving reasonable reliance upon the Debtor's misrepresentations.

■■■ We finally consider whether the Debtor had the requisite intent necessary under Sec. 523. The Sixth Circuit evaluated this element in *In re Martin,* 761 F.2d 1163 (6th Cir.1985), where it wrote:

The [debtors] make a further defense against the denial of discharge by arguing that they did not make or publish the financial statement with intent to deceive the bank. The standard, however, is that if the debtor either intended to deceive the bank or acted with gross recklessness, full discharge will be denied. [citations omitted]. That is, the debtor must have been under some duty to provide the creditor with his financial statement; but full discharge may be disallowed if the debtor either intended the statement to be false, or the statement was grossly reckless as to its truth.

*Id.* at 1167. Thus, either intentional deception or gross recklessness by the Debtor will allow the debt to be excepted from discharge under Sec. 523(a)(2)(B). In appropriate cases, this intent may be inferred from the totality of the evidence. *In re Gould,* 73 B.R. 225 (Bankr.N.D.N.Y.1987). Here, however, the Court is unwilling to infer intent to deceive from the existence of the claimed false representations.[6]

4. CTA's contention that the undisclosed debt was not of the type that would normally appear on a credit report is without support. *In re Howard,* relied upon by CTA, dealt with private lenders and is inapposite here. Furthermore, Ms. Kerrigan's testimony that credit card balances cannot be verified over the phone, absent the Debtor's authorization, increases the importance of obtaining a credit report.

5. The Court believes that such reliance would have been misplaced. Additionally, even though the Debtor had a good payment history on this one obligation, such a history does not constitute sufficient "previous financial dealings" to reduce the needed showing of reasonable reliance as contemplated in *Knoxville Teachers Credit Union v. Parkey,* 790 F.2d 490, 492–93 (6th Cir.1986).

6. As a general proposition, the Court agrees that the omission of liabilities and inclusion of unanticipated income might be sufficient to infer an intent to deceive. However, in this case, the

The evidence strongly suggests that the Debtor's intent was to escape the distressing, and possibly harassing, phone calls received from representatives of CTA. While the Debtor's signature on the application which misstated both her liabilities and income may have been careless, it did not constitute gross recklessness.[7] Moreover, the evidence as a whole suggests the Debtor's intent was not to deceive CTA, but was to terminate the collection efforts in which CTA engaged. While we do not condone the Debtor's careless conduct, we are also unable to overlook the effects of the intimidating tactics in which CTA apparently engaged. A creditor should not be heard to complain when their conduct induces a debtor to sign an application completed by the creditor, without either of them fully reviewing the information for its accuracy.

Based on the testimony heard at trial, the Court also believes that Mr. Russell suggested the Debtor apply for the refinancing. Mr. Russell testified that he would not have suggested a refinancing since that was contrary to company policy. While such a practice may be against company policy, the Court does not find Mr. Russell's testimony, regarding the Debtor's initiation of discussions concerning a possible refinancing, to be entirely credible.[8] While it may have been subtle, the Court believes Mr. Russell either directly or indirectly influenced the Debtor to seek refinancing. While CTA touts its compassion and flexibility in allowing the refinancing, the evidence suggests that CTA's agents were motivated by something other than altruism. While it is true that the refinancing reduced the Debtor's monthly obligation, it is also true that CTA increased the annual interest rate from 24.98 percent (24.98%) to 25.40 percent (25.40%) and de-ferred the completion of repayment an additional nine (9) months past the originally anticipated completion date. The combination of these factors would tend to allow CTA to realize more money from the refinancing agreement than it would have received under the original agreement. The refinancing also eliminated a delinquent account. Thus, there was sufficient reason for CTA to encourage the Debtor's acceptance of a refinancing arrangement in this situation.[9]

The evidence also shows that Mr. Russell took the application over the telephone and completed all necessary processing the same day. The Court has some question as to whether Mr. Russell actually "cautioned the Debtor to disclose all of her obligations," as the Plaintiff's counsel stated in one of his leading questions. The Court is also not persuaded that Mr. Russell inquired about the status of all creditors who were listed on the original application but were deleted on the second application. In any case, CTA did not bear its burden of proving the necessary intent to render the Debtor's obligation to CTA non-dischargeable by clear and convincing evidence.

The obligation of Debtor to CTA is found to be dischargeable. An appropriate Order shall be entered.

Court believes the consideration of other facts justifies the Court's decision not to draw such an inference.

7. The Court admits this is a close call. The sheer magnitude of the Debtor's undisclosed obligations notwithstanding, the Court must reach a decision based on the evidence as a whole.

8. Mr. Russell's testimony was partly discounted, not only on account of his demeanor, but also on account of counsel's extensive leading on direct examination. On a review of the testimony, the Court was disturbed by counsel's extensive leading on important issues of fact, this despite the lack of objection by Debtor's counsel.

9. This is not to suggest that Ms. Kerrigan did not consider other extenuating factors, such as the Debtor's disability, in approving a refinancing arrangement.