In re Stephen M. WESTMAN, Valinda M. Westman, dba Perich Studio Photography, fdba IHS Photography, Debtors.

Peter PERICH and Ann Perich, Plaintiffs,

v.

Stephen M. WESTMAN, and Valinda M. Westman, Defendants.

Bankruptcy No. B87–00810–Y.

United States Bankruptcy Court, N.D. Ohio.

Dec. 30, 1988.

Nancy E. Yakubek, Warren, Ohio, for plaintiffs.

James H. Beck, Canfield, Ohio, for debtors/defendants.

WILLIAM T. BODOH, Bankruptcy Judge.

This cause came before the Court on the Complaint filed by the Plaintiffs, Peter and Ann Perich, in which they ask the Court to find the Debtors' obligation to them to be nondischargeable pursuant to 11 U.S.C. Sec. 523(a)(2).

## FACTS

The Plaintiffs operated a successful and established photography business in Warren, Ohio, known as "Perich Studio Photography." After approximately 37 years of operation, the Plaintiffs decided to sell the business so that they could retire. To elicit purchase offers, the Plaintiffs advertised in both local and professional publications. The Plaintiffs received several inquiries from prospective purchasers, one of whom was the Debtor, Mr. Westman. It appears that the Debtors initially traveled to Ohio to investigate the business in April, 1984. Over the next several months, both the Plaintiffs and the Debtors discussed the terms, prices and possible financing sources available for a purchase of the studio. In August, 1984, the Debtors submitted to the Plaintiffs a letter of intent and Two Hundred Fifty & 00/100 Dollars ($250.00) earnest money to purchase the business, inventory and equipment, and associated real estate from the Plaintiffs. The agreement envisioned a cash sale of Two Hundred Thousand & 00/100 Dollars ($200,000.00) with Twenty Thousand & 00/100 Dollars ($20,000.00) down payment and the balance to be financed through a loan procured by the Debtors. The Debtors borrowed Twenty Thousand & 00/100 Dollars ($20,000.00) for the down payment from Mr. Westman's mother, Florence Dormey, and deposited Nineteen Thousand, Seven Hundred Fifty & 00/100 Dollars ($19,750.00) in an escrow account. A formal asset purchase agreement was completed on October 22, 1984, the same date that the Debtors began operating the business. On November 8, 1985, the Debtors executed a Thirty Thousand & 00/100–Dollar ($30,000.00) promissory note in favor of the Plaintiffs. The following day, the Plaintiffs received the balance of the Nineteen Thousand, Seven Hundred Fifty & 00/100–Dollar ($19,750.00) down payment which had been in escrow.[1]

In January, 1985, Aetna Finance Company, dba ITT Financial Services ("ITT"), sent Mr. Greg Zusan to view the property.

---

1. The down payment was paid to the Plaintiffs in two disbursements—$10,000 on November 2, 1984, and $9,816.57 (which included accrued interest) on November 9, 1984.

Mr. Zusan cataloged the inventory, equipment and other photographic supplies and on January 10, 1985, filed a financing statement claiming a security interest in those items. Although the security interest was claimed, no loan had either been made or committed on or before that date by ITT. At sometime thereafter, it appears ITT notified the Debtors of a willingness to loan One Hundred Seven Thousand & 00/100 Dollars ($107,000.00) to them secured by business assets. When the Plaintiffs were advised that ITT was only willing to loan One Hundred Seven Thousand & 00/100 Dollars ($107,000.00) to the Debtors, Plaintiffs agreed to accept an Eighty Thousand & 00/100–Dollar ($80,000.00) promissory note from the Debtors, secured by a second mortgage on the commercial property and a first-position security interest in all photographic equipment and inventory. This information was forwarded to Mr. Zusan by the Plaintiff's attorney, Kay L. Williams, ESQ., on January 22, 1985, and it appears he, on behalf of ITT, agreed to Plaintiffs having a first lien on the equipment and inventory (Defendant's Exhibit 16). As additional security, the Plaintiffs also sought to obtain a second mortgage on the Debtors' former residence located in South Bend, Indiana. The Plaintiffs were aware of a financial statement in which the Debtors represented that the Indiana house was worth Forty–Five Thousand & 00/100 Dollars ($45,000.00) with a first mortgage of Eighteen Thousand, Two Hundred Twenty & 44/100 Dollars ($18,220.44).

On February 8, 1985, the Plaintiffs, the Debtors, and Kevin P. Sullivan, ESQ., of Milwaukee, Wisconsin, representing ITT, met at Ms. Williams' office to close the purchase transaction. Numerous documents were signed at the closing. The Debtors signed a promissory note for One Hundred Seven Thousand & 00/100 Dollars ($107,000.00) in favor of ITT, secured by a first mortgage on the commercial real property. The Debtors also signed a promissory note for Eighty Thousand & 00/100 Dollars ($80,000.00) in favor of the Plaintiffs, secured by a second mortgage on the commercial real property. The Plaintiffs executed a general warranty deed in the commercial real property to the Debtors. Testimony shows that Mr. Sullivan had with him various security documents which would create in ITT a first-lien position with respect to the equipment and inventory. It further appears that Ms. Williams showed Mr. Sullivan correspondence between her and Mr. Zusan providing for the Plaintiffs to have a first position in the equipment and inventory and ITT to have a second position. It further appears from the testimony that Mr. Sullivan agreed that appropriate steps could be taken after the closing to secure the first position in the equipment in the Plaintiffs and a second position in ITT, and the Plaintiffs and Ms. Williams relied upon his professional representation in that respect. Mr. Sullivan was the only representative of ITT at the closing. Late in the afternoon, all the parties walked to the Recorder's office to file the various documents. It appears that after Ms. Williams and the Plaintiffs left the Recorder's office, Mr. Sullivan and the Debtors remained at the Recorder's office and executed and filed a financing statement giving ITT a first-position security interest in all photographic equipment and supplies. Finally, on February 11, 1985, the Plaintiffs authorized the filing of a second mortgage on the Debtors' property in South Bend, Indiana.

It is not clear to the Court why Mr. Sullivan or ITT, or both of them, were not made parties to this proceeding. The testimony and documentary evidence before us supports the conclusion that Mr. Zusan of ITT had stated before the closing that ITT would agree to Plaintiffs having a first position in the equipment and inventory and that ITT would take a second position. It seems clear that Mr. Sullivan knew of his client's acquiescence in this respect and that at the closing, he agreed and represented that appropriate steps would be taken after the closing to see to the creation of the agreed lien interest in the equipment and inventory. The testimony in this respect is supported by Defendant Exhibit 16 and finds further support in the fact that Mr. Zusan, on January 10, 1985, filed a financing statement claiming a security in-

terest in the equipment and inventory, even though no loan had either been made or committed on or before that date. Mr. Sullivan's remaining at the Recorder's office with the Debtors after the other parties left and executing and filing the financing statement giving ITT a first-position lien in the equipment and inventory appears to this Court, from the evidence before it, to have been knowingly fraudulent. It is not explained why Ms. Williams did not take appropriate action after February 8, 1985, to discover and to rectify this apparent fraudulent act. The Court will inquire further as to whether ITT may have obtained property of the estate fraudulently and will bring Mr. Sullivan's action to the attention of the appropriate authorities.

The Debtors paid interest on their obligations to Plaintiffs until April 15, 1985. On that date, the balance of the obligation was due and Debtors found themselves unable to pay that balance. As previously agreed, plaintiffs renegotiated the obligation in order to give the Debtors an additional two years to pay off the note. The Debtors defaulted under this arrangement in October, 1986. On January 24, 1987, the Debtors executed and delivered the deed to the real estate in Indiana to the first mortgagee in lieu of foreclosure. Plaintiffs apparently had no advance notice of this and have received no accounting for the sale proceeds, despite their having a second mortgage and the property, by Debtors' calculation, having some Twenty-Seven Thousand & 00/100 Dollar ($27,000.00) equity. The Debtors closed their business in June, 1987, and filed a Petition for Relief under Chapter 7 of Title 11 of the United States Code on June 30, 1987. The instant Complaint was filed by the Plaintiffs on September 28, 1987.

## DISCUSSION

■ The Plaintiffs' first complain that the Debtors' obligation to them ought to be nondischargeable pursuant to 11 U.S.C. Sec. 523(a)(2)(B). The Court has previously held that Plaintiffs are responsible for proving four (4) elements in a nondis-

chargeability action pursued under Sec. 523(a)(2)(B). These elements are:

(1) Debtors made a materially false representation in writing;

(2) The false writing concerned the Debtors' financial condition;

(3) The creditor relied on the representation in extending credit and the creditor's reliance on the representation was reasonable; and

(4) The representation was made with the intent to deceive.

*Credithrift of America v. Greene (In re Greene)*, 85 B.R. 747, 750 (Bankr.N.D.Ohio 1988).

The Plaintiffs cannot succeed on this count because they fail to prove the first element. Although Joint Exhibit 1–C was identified and extensive testimony was elicited concerning it, Defendant's counsel refused to stipulate to it and Plaintiffs' counsel did not move for its admission. However, even if the Exhibit had been admitted, the Plaintiffs would still fail because the Court has searched the record in vain to locate any evidence showing the Defendant's representation of the value of the Indiana property to be false. In their Complaint, the Plaintiffs allege the true value of the Indiana property to be Nineteen Thousand & 00/100 Dollars ($19,000.00) instead of Forty–Five Thousand & 00/100 Dollars ($45,000.00), as the Debtors represented in the financial statement. There is no evidence in the record to support that allegation. As a result, the Court will dismiss this Count of their Complaint.

■ The Plaintiffs also claim that the Defendant's obligation to them should not be discharged pursuant to 11 U.S.C. Sec. 523(a)(2)(A), which provides:

(a) A discharge ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The Debtors testified that they agreed to provide Plaintiffs with a first-position security interest in the photographic equipment. The testimony shows that these representations were made by Debtors to persuade Plaintiffs to finance Eighty Thousand & 00/100 Dollars ($80,000.00) of the purchase price.[2] Thus, the representations were made in order to procure an extension of credit from the Plaintiffs.

The Court finds the culpability of the Debtors to be clearly established by the testimony of Ms. Florence Dormey, Mr. Westman's mother. Ms. Dormey worked for her son at the photography studio until about January, 1987. Ms. Dormey stated in her testimony that Mr. Westman had stated his dislike of Plaintiffs. Moreover, she testified that her son told her elatedly, "Boy, I fixed them" after the closing of the transaction in February, 1985. Ms. Dormey testified that when she questioned her son regarding his meaning, Mr. Westman told her that he had given ITT a first lien on the equipment. Mr. Westman did not deny the testimony of his mother but only said he could not remember making the statements. Mr. Westman's testimony shows he knew that Plaintiffs expected a first-position security interest in the equipment, which he gave to ITT. Thus, the Court finds that the Debtors intended to deceive and/or defraud the Plaintiffs. Debtors' counsel attacked Ms. Dormey's credibility and the materiality of her testimony. We do not find either argument to be persuasive. The Court is satisfied that Ms. Dormey was competent to testify, as she had personal knowledge of the events. We do not find her status as a creditor or her unrelated attempted suicide to cast doubt upon her credibility. Indeed, we credit her testimony from our observation of her demeanor during the trial. Debtors' counsel admits the relevance, but disputes the materiality, of Ms. Dormey's testimony. We summarily reject this argument.[3]

It also appears that the Plaintiffs reasonably relied on the Debtors' representations that he would give them a first-position security interest in the equipment. There is nothing to suggest the Plaintiffs were unreasonable in their reliance. The testimony clearly established that this was the minimum security which the Plaintiffs would accept in order to finance part of the purchase price. Finally, the Plaintiffs were injured by their loss of security caused by the actions of Debtors and Mr. Sullivan.

Plaintiffs' Objection shall be sustained and Debtors' obligation to the Plaintiff shall be found to be nondischargeable.

This shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

An appropriate Order shall issue.

---

**2.** Although we have couched this opinion in terms of false representations, the decision reached here would be identical whether the Debtors utilized false pretenses or actual fraud in their dealing with the Plaintiffs.

**3.** The concept of materiality now is included within the scope of relevancy as defined in Rule 401 of the Federal Rules of Evidence. The Debtors' culpability is certainly a "fact of consequence" in a dischargeability proceeding brought under 11 U.S.C. Sec. 523(a)(2)(A).