In re Timothy Lee CURRIN, aka Tim Currin, and as an Officer, Director and shareholder of Ptarmigan Associates, Inc., Social Security No. 460–80–1632, Debtor.

Sidney W. ANDERSON, JR., et al., Plaintiffs,

v.

Timothy Lee CURRIN, aka Tim Currin, Defendant.

Adv. No. 85 C 0216.
Bankruptcy No. 84 B 06407 C.

United States Bankruptcy Court, D. Colorado.

Dec. 19, 1985.

W.C. Davis, Jr. and Harrison F. Russell, of Russell, Angelo & Wright, P.C., Gunnison, Colo., for plaintiffs.

Sheila Porter and Nancy D. Miller, of Sterling and Miller, P.C., Denver, Colo., for defendant.

## FINDINGS, CONCLUSIONS AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY

PATRICIA ANN CLARK, Bankruptcy Judge.

The matter before the Court is the complaint to determine dischargeability filed by owners of certain condominium units in Mt. Crested Butte, Colorado. Plaintiffs contend that the defendant-debtor, Timothy L. Currin, should be held individually liable for debts of a corporation that, they claim, violated the provisions of Section 523(a)(4) of the Bankruptcy Code and that these debts should be excepted from discharge in Currin's bankruptcy proceeding. A trial on the complaint was held on October 31, 1985.

The facts in this case are as follows. Prior to his bankruptcy, Currin was in the property management business as an officer and director of Ptarmigan Mountain Properties (PMP). PMP, originally formed in 1978 as a joint venture between Crested Butte Mountain Resort and Ptarmigan Associates, Inc. (PAI), performed property management services for owners of condominiums in the vicinity of Mt. Crested Butte, Colorado. In April, 1980, PAI purchased Crested Butte Mountain Resort's interest in the joint venture and began operating PMP as a division of PAI. In April, 1981 PMP was incorporated and became a licensed corporate real estate broker, with Michael Wesley as its designated broker. From PMP's incorporation until March, 1982, Currin acted as secretary-treasurer and director. Currin did not directly own shares of PMP but was a 60 percent shareholder of PAI, which, in turn, owned 48 percent of PMP's shares. Wesley, who was an officer and director of the corporation from June 12, 1981 to December 28, 1981, owned 20 percent of PMP's shares. Don Gunnin, president and director until his resignation in April, 1982, owned the remaining 32 percent.

Currin participated in the management of PMP until the spring of 1980 when Don Gunnin became PMP's general manager. As general manager, Gunnin apparently performed the day-to-day management while advising Currin and other officers and directors of the general activities and financial condition of PMP.[1] Gunnin acted in this capacity until his resignation on April 5, 1982.

As a division of PAI and later as a corporation, PMP entered into various rental management agreements with plaintiffs, the owners of condominium units. On behalf of the plaintiffs, PMP collected rental income for such units. Pursuant to the original compensation agreement between PMP and plaintiffs, PMP received a 15 percent management commission based on net rental revenue and plaintiffs were obligated to pay all operating expenses. In the fall of 1981, PMP agreed to the owners' request to change the compensation structure. Under the new agreement, the own-

---

1. Review of the financial condition and general activities of the corporation by the officers and directors of PMP occurred only occasionally from the spring of 1980 until October, 1981, at which time Gunnin began to consult with Currin on a monthly basis.

ers received 55 percent of the gross rental revenue and PMP received the remaining 45 percent, with the attendant obligation to pay all expenses.

The financial position of PMP grew steadily worse each season of operation. Initially, PMP, as a division of PAI, showed a loss in 1979–1980 of approximately $30,-000. Due primarily to a lack of snow in the 1980–1981 ski season, PMP again suffered a loss; this time in the amount of $190,000. Bank borrowing was necessary to make expenses for that year.

In the 1981–1982 season, PMP hoped to recoup its previous losses. Before the season began, Gunnin as General Manager presented a projected profit of $200,000 at PMP's board of director's meeting. As the season progressed, Gunnin indicated that the profit would be substantially smaller and revised his projections to show a $100,-000 profit. In mid-January, Gunnin again revised the figures, this time indicating that PMP would break even. In late February, 1982, as the season drew to a close, Gunnin projected that PMP would lose $100,000. Testimony indicates that Currin was kept abreast of these projections through board meetings and consultations with Gunnin.

Due to the reversals suffered by PMP in the 1981–1982 season, cash shortfalls occurred with debts and expenses remaining unpaid. During this time, money was transferred from PMP to Currin and to companies in which Currin had interests. For example, PAI received checks totaling $63,661.08, Ptarmigan Sports [2] received $2,541.88, Ptarmigan Development Company [3] received $46,000 and Currin $27,759.45. Although most of the checks were signed by Gunnin, a few bore Currin's signature. The dates of payment range from November 6, 1981 through April 5, 1982. The transfer of money evidenced by these checks appears, for the most part, to be for legitimate debts and expenses of PMP.

Beginning in February, 1982, plaintiffs failed to receive their share of the rental revenue. In a letter dated April 22, 1982, signed by Currin and Robert Pino, plaintiffs were advised that rental revenue remittance for February and March would be "delayed." The owners never received the full amount of the February and March rental payments, and it is this obligation that they are litigating here.

On December 31, 1984, Currin filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. In this adversary proceeding, the plaintiffs seek to charge Currin with defalcation while acting in a fiduciary capacity and thus seek to except the debt from discharge under Section 523(a)(4). Although Section 523(a)(4) also provides that a debt can be excepted from discharge for embezzlement and larceny, the plaintiffs are not pursuing any such claim. Plaintiffs argue that PMP, as a licensed real estate broker, was a fiduciary to plaintiff, that under state law it held certain sums in trust for the plaintiffs and that the use of the funds for purposes other than payment to plaintiffs was defalcation while acting in a fiduciary capacity. Plaintiffs contend that Currin participated in this defalcation and should be personally liable. Currin submits that no fiduciary or trust relationship existed between plaintiffs and PMP, that each of the plaintiffs and PMP were joint venturers in the rental of their individual condominium units, and that plaintiffs did not sustain their burden of proving that he should be held personally liable for corporate debts.

Section 523(a)(4) of the Code provides in pertinent part:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

**2.** Ptarmigan Sports was a ski rental company incorporated in 1981 by Currin and Robert Pino. Currin and Pino were also officers and shareholders in Ptarmigan Sports.

**3.** Ptarmigan Development Co., formed to develop commercial and residential property in Mt. Crested Butte, was incorporated by Currin, Pino and Gunnin, all of whom were 33⅓ percent shareholders.

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny....

In order to determine whether the subject debt is to be excepted from discharge under Section 523(a)(4), this Court must consider three questions. First, it must decide whether the debt in question arose while PMP was acting in a fiduciary capacity. Then, it must decide whether the debt owed by PMP while acting as a fiduciary resulted from defalcation. If so, the Court must determine whether the debtor, through his conduct as an officer and director of PMP, may incur liability to creditors of the corporation which is non-dischargeable in his individual bankruptcy proceeding.

■ The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context. *In re Cairone,* 12 B.R. 60, 62 (Bankr.D.R.I.1981). The meaning of "fiduciary" in Section 523(a)(4) is an issue of federal law which limits its application to express or technical trusts. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). The debt alleged to be non-dischargeable must arise from a breach of trust obligations imposed by law, separate and distinct from any breach of contract. *In re Johnson,* 691 F.2d 249 (6th Cir.1982).

■ Although the concept of fiduciary is narrowly defined as a matter of federal law, state law is to be construed to determine when a trust in this strict sense exists. *In re Pedrazzini,* 644 F.2d 756, 758 (9th Cir.1981). A fiduciary relationship may arise by operation of a state statute which imposes trust-like obligations on those performing certain activities. *In re Whitlock,* 449 F.Supp. 1383, 1390 (Bankr. W.D.Mo.1978).

Plaintiffs do not assert that the parties' contract creates the requisite trust but instead contend that the "fiduciary" capacity referred to in section 523(a)(4) is imposed by statute, in particular sections 12–61–

113(g) and 12–61–113(g.5), C.R.S. Colorado has enacted legislation governing the issuance of licenses for those engaged in the real estate business. Section 12–61–102, C.R.S. provides that it is unlawful to engage in the business or capacity of real estate broker or real estate salesman without having received a license. A real estate broker is defined as meaning, among other things, any person, firm, partnership or corporation who engages in the act of renting or leasing real estate. Section 12–61–101. Section 12–61–113 provides for the revocation or suspension of licenses on certain grounds, including the following:

(g) Failing to account for or to remit, within a reasonable time, any moneys coming into his possession which belong to others, whether acting as real estate brokers, salesmen, or otherwise, and failing to keep records relative to said moneys, which records shall contain such information as may be prescribed by the rules and regulations of the commission relative thereto and shall be subject to audit by the commission;

(g.5) Commingling funds of others with his own or failing to keep such funds of others in an escrow or a trustee account with some bank or recognized depository in this state, which account may be any type of checking, demand, passbook, or statement account insured by an agency of the United States government and to so keep records relative to the deposit which contain such information as may be prescribed by the rules and regulations of the commission relative thereto, which records shall be subject to audit by the commission; ....

According to plaintiffs, sections 12–61–113(g) and 12–61–113(g.5), C.R.S. create a special relationship between plaintiffs and PMP, analogous to that found by other courts to give rise to a statutory trust within the purview of Section 523(a)(4).

In recent years courts have had the opportunity to consider situations where state statutes impose obligations on parties handling the disposition of certain funds. These cases reach conflicting results on

similar facts and are difficult to reconcile with one another. One court has held that the term "fiduciary" is limited to traditional trust relationships, not trusts implied in law or imposed by statute. *See In re Katzen,* 47 B.R. 738 (D.Mass.1985). Other courts have held that only statutes which expressly designate funds as "trust funds" create a fiduciary relationship, while those imposing criminal sanctions or penalties for failure to properly dispose of funds do not create the requisite "fiduciary" capacity. *See, e.g., In re Pedrazzini,* 644 F.2d at 758; and *In re Mettetal,* 41 B.R. 80 (Bankr.D. Tenn.1984).

While there are other relevant cases,[4] we are bound to follow the Tenth Circuit's decision in *Allen v. Romero,* 535 F.2d 618 (10th Cir.1976) which involved facts much like those in the instant case. In *Romero,* the court construed a New Mexico statute which provides for revocation of a building contractor's license if funds advanced for a completion of a particular contract were diverted to other purposes.[5] In deciding whether a fiduciary relationship existed between a contractor and an owner when the contractor made payments to subcontractors and materialmen, the Court examined the purpose and effect of the statute. It found that the purpose of the licensing scheme, as stated by the Supreme Court of New Mexico, was to protect the public from irresponsible or incompetent contractors. Further, it found that because a license must be obtained prior to any dealings with particular parties, a duty arises prior to and independent of the claim of misappropriation.[6] *Romero,* 535 F.2d at 622. Accordingly, the court found that the licensing scheme imposed a fiduciary duty under section 523(a)(4) on the contractor who had been advanced funds pursuant to construction contracts.

■ This Court may not obviate the Tenth Circuit's decision with an alternative view of the proper scope of licensing statutes. Following the reasoning of *Romero,* it is clear that the Colorado real estate broker's licensing statute creates a trust relationship between brokers and those whose funds are held by the broker. The Colorado legislature has advanced a comprehensive scheme for the issuance of licenses to those engaged in the real estate business. *See* sections 12–61–101 through 12–61–407, C.R.S. Absent a license it is illegal to engage in the business of a real estate broker or salesman, including the rental of real estate. The purpose of the licensing scheme is to establish that one requesting a license "is truthful and honest and otherwise of good moral character; and that in addition to any other requirements of this Section he is competent to transact the business of a real estate broker or real estate salesman in such manner as to safeguard the interest of the public." 12–61–102, C.R.S. Under the applicable sections, each licensed broker is required to maintain records for each project, remit monies due to others, may not commingle funds of others with his own and must keep funds of others in an escrow or trustee account. Thus, under the rationale of *Romero,* the statute creates a "statutory trust" and imposes a fiduciary duty on brokers licensed under its terms.

■ In the instant case, PMP, acting in its role as broker, had a fiduciary duty to plaintiffs in handling of their rental revenues. The provisions of the real estate licensing scheme were clearly applicable to PMP. It was a licensed real estate broker and was handling money "which belongs to others." That is, the rental management agreement specified that owners were to

---

**4.** *See In re Specialized Installers, Inc.,* 12 B.R. 546 (Bankr.D.Colo.1981).

**5.** The statute, section 67–35–26 N.M.S.A. (1953), provides for revocation or suspension of a license on the ground of:

G. diversion of funds or property received for prosecution or completion of a specific contract, or for a specified purpose in the

prosecution or completion of any contract, obligation or purpose; . . . .

**6.** The primary criticism of *Romero* appears to be based on the principle that a trust cannot arise in the abstract, upon obtaining a contractor's license, but only among particular parties. *See, e.g., In re Angelle,* 610 F.2d 1335 (5th Cir. 1980).

receive 55 percent of the rental revenues. One agreement, which was stipulated to be representative of all others, stated in part, "owner shall receive his portion of the gross rental revenue regardless of the collectibility of guest funds." It is clear that this 55 percent was absolutely due owners and was, in fact, the money of the owners even while in PMP's possession. Because PMP is a licensed broker the duties imposed upon it by law were prior to any dealings it had with plaintiffs and accordingly, it had a fiduciary duty to owners of these funds.

The debtor also contends that no fiduciary relationship existed in the present circumstances because the individual plaintiffs and PMP were joint venturers in the rental of their condominium units. The Supreme Court of Colorado, in the case of *Realty Development Co. v. Feit,* 154 Colo. 44, 387 P.2d 898 (1963) adopted a tripartite test for determining whether a joint venture relationship exists:

> (1) There must be joint interest in the property by the parties sought to be held as partners; (2) there must be agreements express or implied, to share in the profits and losses of the venture; and (3) there must be actions and conduct showing cooperation in the project. None of these elements alone is sufficient.

*Realty,* 154 Colo. at 46, 387 P.2d at 899.

■ Here, PMP did not hold a joint interest in the condominiums, rather it performed condominium management services. In addition, there was no agreement to share in the profits or losses of the venture, there was merely a contract under which PMP would perform various services for a fixed percentage of the gross rental receipts. Whether PMP made or lost money was completely independent of whether the owners made or lost money. Since two of the three factors necessary to finding a joint venture are not present, the defendant's defense fails. Accordingly, PMP owed a fiduciary duty to the condominium owners in handling their rental revenue.

Once a fiduciary relationship has been found to exist, the second issue under 11 U.S.C. § 523(a)(4) is to determine whether a fiduciary has committed defalcation. Plaintiffs contend that PMP's failure to remit rental revenues falls within the settled definition of defalcation. Debtor admits that money due owners remains unpaid but argues that PMP's failure to pay was the product of poor business judgment rather than defalcation.

■ While defalcation, in the context of Section 523(a)(4) does not always lend itself to a precise definition, it is clear that it is more encompassing than either "embezzlement" or "misappropriation." *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937). *See generally,* 3 *Collier on Bankruptcy,* ¶ 523.14 (15th ed. 1985). The court in *Central Hanover* stated:

> All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time it may, he is guilty of a "defalcation" though it may not be a "fraud" or an "embezzlement" or perhaps even a "misappropriation."

*Central Hanover,* 93 F.2d at 512.

■ An analogous situation existed here. PMP was authorized to collect all rental proceeds, but its right to possession was conditional since PMP was required to turn over 55 percent of these proceeds to the owners. The owners' share should have been segregated in a trust account. All business expenses should have been paid out of PMP's operating account which rightfully could contain 45 percent of the rental proceeds. Therefore, 55 cents out of every dollar collected belonged to the owners and should have been distributed to them. Yet by using the owners' portion of the proceeds for its own business expenses, PMP went beyond its conditional authority and is guilty of defalcation.

Nor is PMP's diversion of trust assets for its own use the product of mere negligence or mistake. *See In re Hammond,* 98 F.2d 703, 705 (2d Cir.1938), *cert. denied,* 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938). As a fiduciary, PMP was charged

with knowledge of its legal duties under Colorado statutes governing licensing of real estate brokers and salesmen. PMP knew, or should have known, that the owners' money was entrusted to it and it had a duty to account for and remit to the owners their portion of the rental revenues. Thus, PMP's diversion of trust assets for its own use was a breach of trust, and as such, constitutes a defalcation under 11 U.S.C. § 523(a)(4).

█ The next question presented is whether Currin's participation in the defalcation committed by PMP rises to a level sufficient to hold him personally liable for the resulting debt. Generally officers and directors of a corporation are not liable for debts of a corporation merely because they act as officers and directors or are engaged in active management of the corporation. *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597 (S.D.N.Y. 1971). However, an officer or director may be personally liable to a corporate creditor under certain circumstances. For instance, where the corporation itself is a "trustee" holding specific funds for the benefit of a particular creditor, a corporate officer who knowingly causes the misappropriation of the trust property is personally liable for the breach of trust committed by the corporation, even if the officer did not personally profit from the transaction. *In re Folliard*, 10 B.R. 875 (D.Md.1981). Additionally,

> [W]hen a corporation as an entity is placed in a fiduciary capacity it is the corporate officer who is charged with performing the fiduciary duties and living up to the terms of the agency. If the fiduciary relationship is not imposed upon the corporate officer charged with maintaining the fiduciary relationship, then § 523(a)(4) could be rendered meaningless in cases where the fiduciary relationship is established between a creditor and a corporate fiduciary only.

*In re Koszuth*, 43 B.R. 104, 108 (Bankr.M. D.Fla.1984); *see also In re Schultz*, 46 B.R. 880 (Bankr.D.Nev.1985).

The debtor asserts that he did not knowingly participate in any misappropriation, and was unaware of the crucial transfers until it was too late. The debtor's explanation, examined in light of the evidence, defies credulity. To begin with, PMP was a closely held corporation run entirely by Currin, Pino and Gunnin, and two of their signatures were required on any withdrawal from the trust account. Although Gunnin ran PMP's day-to-day operations until about the time of his resignation in April, 1982, Currin participated in the important financial and policy decisions made on behalf of the corporation. It was in his role as an officer and director of PMP and the other Ptarmigan entities that Currin either knew or should have known about the misuse of the trust assets.

First of all, during a period in which he was aware of PMP's poor financial health, large expenditures were made from PMP to Currin individually, or to the three other closely held Ptarmigan entities in which Currin held an interest. Currin was cognizant of PMP's financial problems as early as the summer of 1981, when he was forced to borrow money through PAI in order to cover PMP's summer operating expenses. Then in or about October, 1981, Currin learned that PMP had lost $190,000 the previous fiscal year. The following winter Currin became aware that Gunnin's overly optimistic projections were not being realized so that by mid-February, 1982, Currin assumed a more active role in the company's day-to-day management. Yet between November 6, 1981 and April 5, 1982 a total of $139,662.41 was transferred from PMP to Currin, or to the various Ptarmigan entities. As stated above Currin, individually, received $27,759.45; PAI[7] received $63,661.08, Ptarmigan Development Company[8] received $46,000; and Ptarmigan Sports[9] received $2,541.88. Fi-

---

7. Currin was president and 60 percent shareholder of PAI.

8. Currin was 33⅓ percent shareholder of Ptarmigan Development Company.

9. Currin was a shareholder and officer of Ptar-

nally, Currin, personally, was a signatory on PMP checks totalling $50,090.09.

Although these transfers appear, for the most part, to be for legitimate debts and expenses of PMP, they are probative for two reasons. First, Currin's position as either the payor or payee on some of the transfers belie his claims that he was ignorant of these transfers. Second, since these transfers came at a time that PMP was in severe financial straits, they evince an intent to favor Currin and his Ptarmigan entities with the diverted trust assets. A total of $69,930.36 of the aforementioned transfers was disbursed after February 17, 1982, about the time Currin assumed a more active role in PMP's affairs. Yet the owners never received their entire February and March payments because their trust money was used to pay some of PMP's corporate creditors.

■ Even if the debtor was not actually aware that these transfers were made out of trust assets, such knowledge may be imputed to him. As a corporate officer and director, Currin is charged with knowledge of facts contained in the corporate books and records. *In re Gottheiner*, 3 B.R. 404 (N.D.Cal.1980); *Myzel v. Fields*, 386 F.2d 718, 736 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Further, "the directors of a corporation are charged with a duty of managing its affairs honestly and in good faith, and they must exercise ordinary and reasonable care in the performance of their duties." *Beard v. Achenbach Memorial Hospital Ass'n.*, 170 F.2d 859, 862 (10th Cir.1948). Since Currin was armed with the knowledge that PMP was suffering severe financial problems while he, or his entities accepted large sums of money from PMP, he was clearly put on notice to monitor the rental revenues since it was PMP's primary source of income. As a result, Currin either knew or should have known that the owners' assets were being misappropriated and his defense that he was

unaware of the transfers until it was too late is neither credible nor exculpating.

■ Plaintiffs request attorney's fees and costs of this proceeding based upon a provision in the rental agreements between PMP and individual plaintiffs. The agreement provision states that:

> It is agreed that if any action is brought in court of law [sic] by either party to this agreement as to the enforcement and interpretation or construction of this agreement, or any document provided for herein, the prevailing party shall be entitled to reasonable attorney's fees as well as all cost incurred in the prosecution and defense of such action.

This agreement is made between PMP and plaintiffs, not Currin and plaintiffs. Currin is not a party to this agreement and is not bound by its terms. Therefore, there is no basis for an award of fees and costs in this action.

For the foregoing reasons, it is ORDERED that the debt owed by Ptarmigan Mountain Properties to Sidney W. Anderson, Jr., et al., is non-dischargeable in Timothy Lee Currin's individual bankruptcy proceeding.

FURTHER ORDERED that the parties shall have 10 days from the date this Order becomes final to file a written request for the withdrawal of all exhibits received in evidence, after which time the exhibits will be destroyed by the Deputy Clerk without further order of the Court.