**In re Jeffrey Shawn REGAN and Kerrie Marie Regan, Debtors.**

**Fowler & Peth, Inc., a Wyoming corporation, Plaintiff,**

v.

**Jeffrey Shawn Regan and, Kerrie Marie Regan, Defendants.**

**Bankruptcy No. 03–16625 HRT. Adversary No. 03–1783 MER.**

United States Bankruptcy Court, D. Colorado.

July 6, 2004.

Rene P. Koller, Arvada, CO, for Debtors.

Brian J. Berardini, Harvey L. Kramer, Denver, CO, for Plaintiff.

Stephen E. Berken, Denver, CO, for Defendants and Counter-Claimants.

## ORDER AND MEMORANDUM OPINION DETERMINING DEBT TO BE NONDISCHARGEABLE

MICHAEL A. ROMERO, Bankruptcy Judge.

The Defendants, Jeffrey and Kerrie Regan (collectively the "Regans") filed for Chapter 7 relief on April 14, 2003. Subsequent to the Regans' bankruptcy filing, Fowler & Peth, Inc. ("Fowler") filed an Adversary proceeding to determine the dischargeability of its debt pursuant to 11 U.S.C. § 523(a)(4).

Fowler asserts the Regans should be held personally liable for the outstanding debt owed to that entity pursuant to what is commonly known as the Colorado Mechanic's Lien Trust Fund Statute. *Colo. Rev.Stat.* § 38–22–127 (the "TFS"). Fowler then argues that the obligation is nondischargeable as the actions of the Regans constituted defalcation while acting in a fiduciary capacity. A trial on Fowler's Complaint was held on May 14, 2004. For the reasons discussed below, this Court finds the debt owed by the Regans to Fowler is nondischargeable.

## BACKGROUND FACTS

The Regans are the sole shareholders, officers and directors of Eagle Roofing, Inc. ("Eagle"), an entity specializing in the repair and installation of roofs on buildings in Colorado. At all times relevant to this dispute, Kerrie Regan was the company's Secretary and Treasurer, while Jeffrey Regan served as President.[1] As the sole owners and operators of Eagle, the Regans controlled the cash flow and made all the necessary financial decisions for the entity.

Ms. Regan acted as Eagle's day-to-day bookkeeper from the inception of the corporation in 1997 (an accountant was hired to prepare the corporation's yearly tax returns). Ms. Regan has no formal accounting experience, and her accounting skills are largely self-taught. On any given construction project for which Eagle provided services, Ms. Regan would typically prepare invoices and submit them by facsimile to the various builders or owners. These invoices would include amounts charged to Eagle by suppliers who provided material for each such project.[2] The builder or owner would then pay Eagle in full based upon the invoice amount. Separate files were not kept for each project. Instead, Eagle maintained a general file for each builder/owner.

During the operation of its business, Eagle opened a credit account with Fowler to acquire roofing material and supplies for use in construction projects. In calen-

---

1. Although, Mr. Regan testified he could not remember whether he served as the President of Eagle during calendar year 2000, the documentary evidence stipulated to at trial indicates Mr. Regan was, at the least, the President of Eagle from September 14, 1999 forward.

2. Typically, between 50–60% of a bid for a roofing system to be constructed by Eagle could be attributed to the cost of roofing materials.

dar year 2000, Eagle's finances became increasingly overtaxed. To improve cash flow, the Regans decided to make payments to Eagle's suppliers, including Fowler, based on the dates of the invoices (i.e., the ninety day invoices were paid prior to the sixty day invoices, regardless of the project for which the monies were allocated). In addition, a portion of project receipts was used to pay for the Regans' personal living expenses and other general business expenses owed by Eagle. As a result, although Eagle had been fully compensated for the construction projects into which the materials purchased from Fowler were incorporated, Fowler was not fully paid. As of April 14, 2003, the Regans' bankruptcy petition date, Eagle owed Fowler $48,185.03.

## DISCUSSION

Section 523(a)(4) provides that an individual debtor is not discharged from any debt for defalcation while acting in a fiduciary capacity. In evaluating whether the debt owed to Fowler by Eagle is a dischargeable debt pursuant to Section 523(a)(4) in the Regans' personal bankruptcy case, the following issues are relevant:

1. Whether the debt owed to Fowler arose while Eagle was acting in a fiduciary capacity;

2. Whether the debt owed by Eagle resulted from a defalcation;

3. Whether the Regans, acting as the sole officers and directors of Eagle, are personally liable for any breach of fiduciary duty owed by Eagle to Fowler; and

4. Whether the resulting obligation is of the type that should be nondischargeable in the Regans' personal bankruptcy case.

See In re Currin, 55 B.R. 928, 932 (Bankr. D.Colo.1985).

## A. Did the TFS Create a Fiduciary Relationship between Eagle and Fowler.

The traditional definition of a "fiduciary" (a relationship involving confidence, trust and good faith) has been observed as being far too broad for application in a bankruptcy dischargeability context. In re Cairone, 12 B.R. 60, 62 (Bankr.D.R.I.1981). Federal law limits its application to express and technical trusts, and debts alleged to be non-dischargeable must arise from breach of trust obligations imposed by law, separate and distinct from any breach of contract. In re Currin, 55 B.R. 928, 932 (Bankr.D.Colo.1985); In re Johnson, 691 F.2d 249, 251 (6th Cir.1982).

In Romero v. Romero, 535 F.2d 618 (10th Cir.1976), the Tenth Circuit Court of Appeals found that a New Mexico construction licensing statute created a fiduciary duty under § 523(a)(4) on a contractor who had been advanced funds pursuant to construction contracts. Relying upon this finding, Colorado courts have held that the TFS is unambiguous in its creation of a similar statutory fiduciary relationship. See, e.g., In re Specialized Installers, Inc., 12 B.R. 546, 551 (Bankr. D.Colo.1981). Thus, it must be determined whether the TFS applies in the present situation.

The TFS reads in relevant part:

**38–22–127. Moneys for lien claims made trust funds—disbursements—penalty.** (1) All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a

lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.[3]

Initially, the Regans argue that because Fowler failed to exercise its mechanic's lien rights when it was not paid, it could not "have a lien" necessary to trigger application of the TFS. In reviewing the case law examining the TFS, the interpretation of the phrase, *who have a lien, or may have a lien, against the property,* appears to be a matter of first impression before this Court.

The purpose of the TFS is to "protect homeowners, laborers, and providers of construction materials from dishonest or profligate contractors." *Flooring Design v. Novick,* 923 P.2d 216, 219 (Colo.App.1996) (citing *People v. Collie,* 682 P.2d 1208 (Colo.App.1983)). The Court notes that even though the TFS falls within Article 22 of the Colorado Revised Statutes (entitled "General Mechanic's Lien"), the language of the TFS appears to provide wronged laborers and materialmen with a second source of protection and relief, separate and apart from the traditional mechanic's lien practice. *See First Commercial Corp. v. First Nat'l Bancorporation, Inc.,* 572 F.Supp. 1430, 1434 (D.Colo.1983) (citing *National Bank of Detroit v. Eames & Brown,* 396 Mich. 611, 242 N.W.2d 412, 417 (1976)). For example, if a party fails to comply with the time limits of the general lien statutes or alternatively chooses not to file a lien,[4] the TFS, by its use of the words, *may have a lien,* creates an alternate remedy for the wronged party.

The statutory interpretation urged by the Regans, namely, that Fowler must have perfected its interests by filing a mechanic's lien(s) to fall within the TFS, vitiates the *"may have a lien"* portion of the TFS' language. The Court cannot simply dismiss or ignore this portion of the statute as if it did not exist. Rather, the Court must give credence to the entire statute. *See Echo Acceptance Corp. v. Household Retail Services, Inc.,* 267 F.3d 1068, 1077–1078 (10th Cir.2001) ("Colorado courts interpret statutory language to 'reach a reasonable result consistent with the General Assembly's intent, and ... [to] give harmonious effect to all of the statute's parts'.") (quoting *Sky Fun 1 v. Schuttloffel,* 27 P.3d 361, 370 (Colo.2001)); *See also Colo. Dept. of Revenue v. Cray Computer Corp.,* 18 P.3d 1277, 1281 (Colo. 2001). For that reason, this Court rejects the Regans' argument and holds that if Fowler can establish it had the "potential" for a lien, this portion of the TFS is satisfied.

**3.** The TFS lists two important exceptions to its application. First, in Colo.Rev.Stat. § 38–22–127(2), the TFS exempts coverage from the TFS if the contractor has a "good faith belief" that a subcontractors's lien or claim is not valid or if the contractor, in good faith, claims a setoff. Second, under Colo.Rev.Stat. § 38–22–127(3), if a contractor has furnished a performance or payment bond, or if the owner of the property has executed a written release to the contractor, the TFS does not apply. There has been no evidence or argument provided to the Court that either of these exceptions are applicable in this case.

**4.** There may be situations where a party may be adversely impacted if it filed a lien. By illustration, a contractor may not want to file a lien on property for fear of environmental contamination liability which, under Colorado law, would necessarily inure to the foreclosing party. In the present case, George Snyder, Vice President of Sales for the Denver branch of Fowler, testified that he did not file a lien on any of the roofing projects performed by Eagle for business reasons. Mr. Snyder indicated that Fowler considered the filing of a lien "the court of last resort" as such a filing would reflect negatively upon his company in the industry.

Alternatively, the Regans argue that the TFS cannot apply because Fowler failed to sufficiently identify the *"property"* against which a lien (actual or potential) could attach. This argument also fails as Fowler was able to elicit testimony at trial sufficient to establish that Fowler had the potential right to file mechanic's liens for its unpaid invoices, and specifically identified the property addresses upon which any potential lien could have been filed.[5]

Based on this testimony and on the parties' stipulated facts, the Court finds that even though Fowler did not file any mechanic's liens as a result of unpaid deliveries, it presented sufficient evidence to satisfy the *"may have a lien"* against *"property"* language of the TFS. As a result, Eagle owed to Fowler a fiduciary duty when it received payments on those projects to which Fowler supplied materials.

## B. Did Eagle Commit a Defalcation.

Because the Court has determined a fiduciary relationship existed between Eagle and Fowler, the Court must next answer whether the fiduciary, in this case Eagle, committed a defalcation. Courts have long struggled to provide a precise definition of the term "defalcation."

Generally, under 11 U.S.C. § 523(a)(4) defalcation can be defined as, "a fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, wilful, reckless, or negligent. Furthermore, the fiduciary-debtor is charged with knowledge of the law and its duties." *In re Storie*, 216 B.R. 283, 288 (10th Cir. BAP 1997); *See also Currin*, 55 B.R. at 935 (defalcation is more encompassing than either embezzlement or misappropriation); *See generally, 4 Collier on Bankruptcy*, ¶ 523.10 (15th ed.2004) (defalcation refers to a failure to produce funds entrusted to a fiduciary and applied to conduct that does not necessarily reach the level of fraud, embezzlement, or misappropriation).

In this case, the testimony elicited from Ms. Regan is most relevant to whether Eagle committed a defalcation. Ms. Regan testified that payments received from project owners or builders were not segregated. Rather, such proceeds were deposited into the general Eagle corporate account. Funds from this general account were then used to pay all corporate obligations, as well as certain of the Regans' personal expenses.[6] Although, the Regans

---

**5.** Fowler established it "may have a lien" against several specifically identified properties by going through the meticulous process of addressing each invoice it presented to Eagle for payment during the relevant time period. Mr. Regan, who was working on site for these projects, testified that at least ninety-five percent (95%) of the materials ordered for each address, were incorporated into the property where the materials were delivered. Mr. Regan testified the remaining amounts of roofing material, if any, *may* have been used to start or finish other roofing jobs.

**6.** Specifically, when reviewing Eagle's general ledger, Ms. Regan testified that the corporation's account was accessed to pay NYE & Associates, a Chicago law firm's legal fees for

a child custody matter in the approximate amount of $5,000.00. The account was also used to pay Mr. Matthew Kirsh, a Guardian Ad Litem in connection with the same child custody dispute. Ms. Regan further testified that corporate funds were used to pay for subscriptions to Muscle Magazine, golf outings at Foothills Golf, personal grocery expenses at Byers' General Store, merchandise at a local department store, motorcycle parts at a motorcycle sales and parts store and psychologist fees owed to a Dr. Star. Ms. Regan also testified that Eagle's account may have been used to pay the Regans' personal mortgage. There was further testimony elicited by Fowler that the Regans may have used Eagle's corporate account to pay periodic payments on a recreational vehicle used for

admitted to the use of corporate funds for personal expenses, Ms. Regan indicated any amounts used for personal expenses were reported to Eagle's accountant to be reconciled at the end of the calendar year. Ms. Regan's testimony that any personal expenses were later reconciled for tax purposes is of no relevance to the Court's determination of this matter. The fact remains that Eagle used money it was to hold in trust as required by the TFS for purposes other than for payment to its supplier, Fowler. Thus, a defalcation of such trust funds occurred.

## C. Are the Regans personally liable for Eagle's Breach of Fiduciary Duty.

■ The Court must next determine whether the Regans' participation in the defalcation committed by Eagle rises to a level sufficient to hold them liable for the resulting debt. Under the facts of this case, the evidence is straightforward. The Regans were the sole owners, operators and directors of Eagle. The evidence indicates Eagle was paid in full on every job for which Fowler provided roofing materials. Instead of paying Fowler from the proceeds received from the specific jobs, the Regans admitted to using Eagle's receipts to pay personal and other general business expenses.

In 1981, in *In re Specialized Installers, Inc.*, 12 B.R. 546 (Bankr.D.Colo.1981), a division of this Court concluded that not only was the corporate debtor subject to the TFS, but since he controlled the corporation, the president of the debtor was also personally liable for any breach of the fiduciary duty created by that statute. Seven years later, in the case of *Alexander Co. v. Packard*, 754 P.2d 780 (Colo.App. 1988), the Colorado Court of Appeals applied the TFS to a corporate vice-president of a construction company who controlled the finances of the corporation and diverted trust funds for general corporate obligations. The Court noted that it did not matter whether the officer personally benefitted from the diversion of funds in determining his individual liability. *Alexander*, 754 P.2d at 782. This application of the TFS was reaffirmed in another Colorado Court of Appeals decision, *Flooring Design Associates, Inc. v. Novick*, 923 P.2d 216 (Colo.App.1996).[7] Thus, at least until 2003, there was little question that corporate officers such as the Regans could be held personally liable under the TFS for a breach of the trust fund fiduciary duty created therein.

However, this all changed when the Colorado Supreme Court rejected an attempt to hold officers of a corporation personally liable for a violation of the Colorado Wage

---

both personal and business purposes. Eagle's general ledger further documents other expenses that appear to be personal rather business related.

7. In this case, Edward Novick ("Novick") operated two corporations in the business of residential home building. The corporations contracted with subcontractors, including Flooring Design Associated, Inc. ("Flooring Design"). Flooring Design provided both labor and materials to the two corporations operated by Novick for which it was never paid. In affirming the trial Court, the appeals Court found the record was sufficient to show that the Novick made the financial decisions

for the corporation, controlled their finances, and did not hold money in trust from the proceeds of the sales of the homes to pay Flooring Design. The Court further found the record sufficiently demonstrated that funds from the proceeds of the sales of the residential homes were used for other purposes, such as, payments on corporate vehicles, repayment of a corporate loan to an entity of which Novick was an investor, payment of corporate credit cards, as well as payment of Novick's personal health club membership. The Court affirmed the trial Court's finding that imposition of personal liability on Novick was appropriate under those circumstances.

Claim Act in *Leonard v. McMorris*, 63 P.3d 323 (Colo.2003). The holding in that case indirectly calls into question whether a corporation's officers or agents could be personally liable under any Colorado statute where such liability is not specifically referenced, such as the TFS.

In *McMorris*, the plaintiff's were all former employees of Nations Way, one of the largest privately-held trucking companies in the United States. The defendants had been corporate officers of that entity. *McMorris*, 63 P.3d at 325. In May 1999, NationsWay filed for Chapter 11 protection in the Bankruptcy Court for the District of Arizona. Almost immediately thereafter, the Debtor terminated many of its employees and did not pay wages and other compensation that became due after the filing of the bankruptcy petition. The Chapter 11 case culminated in the confirmation of a liquidating plan in October 2000. *Id.*

A group of those employees filed a suit in a Colorado state court, claiming that the officers of NationsWay were personally liable for the difference between what the employees received under the NationsWay confirmed plan of liquidation and what they were owed, roughly $12,000,000.00, plus penalties and attorneys' fees. *Id.* at 325–26. This case was removed by the officer/defendants to the U.S. District Court for the District of Colorado. Thereafter, both sets of litigants filed motions for summary judgment. The District Court denied the defendants' motion, and granted in part and denied in part, the plaintiffs' cross-motion. *Leonard v. McMorris*, 106 F.Supp.2d 1098 (D.Colo. 2000). After this ruling was appealed to the Tenth Circuit Court of Appeals, that Court, under C.A.R. 21.1, certified to the Colorado Supreme Court two questions concerning the liability of officers and directors under Colorado's Wage Claim Act.[8] *Id.*

The Colorado Supreme Court, *en banc*, applied general rules of statutory construction to the relevant sections of the Colorado Revised Statutes and held that "the officers and agents of a corporation are not jointly and severally liable for payment of employee wages and other compensation the corporation owes to its employees under the Colorado Wage Claim Act." *McMorris*, 63 P.3d at 325. The Court alluded to the Wage Claim Act's adoption in 1901 and its subsequent amendment to expand the definition of an "employer" in 1959. *Id.* at 328–330. Although, the Court conceded the apparent purpose of the amendment "was to make the Act applicable to other entities and persons, beyond just corporations and

---

**8.** The Tenth Circuit's questions of Colorado law were:

 1) Are officers of a now-bankrupt Colorado corporation individually liable for the wages of the corporation's former employees under the Colorado Wage Claim Act, Colo.Rev.Stat. § 8–4–101, *et seq.* (1991)?

 2) If so, are all officers individually liable due to mere status as officers or must the officers have been high-ranking or active decision-makers?

The Colorado Supreme Court, reframed the certified questions as follows:

 1) Whether officers of a corporation are individually liable for the wages of the corporation's former employees under the Col-orado Wage Claims Act, Colo.Rev.Stat. § 8–4–101, *et seq.* (2001);

 2) If so, whether all of the corporation's officers are individually liable or only the officers who have been high-ranking or active decision-makers;

 3) If so, whether the Colorado Wage Claim Act imposes personal liability on officers when the corporation declares bankruptcy; and,

 4) If so, whether the Colorado Wage Claim Act's "good faith legal justification" clause is a defense to the officer's personal liability to former employees under the Act when the corporation files for bankruptcy.

quasi-public corporations," the Court nonetheless found the General Assembly's amendment to the Wage Claim Act did not provide for a substantiative provision making officers and agents personally liable for unpaid wages.[9] *Id.* at 329.

The Court further concluded that well-established principles of agency law generally precluding personal liability of officers and agents had not been abrogated by the 1959 amendment to the Wage Claim Act. Rather, the Court determined "that the General Assembly intended these corporate law principles to function in the context of the Wage Claim Act, not to displace them." *Supra,* at 330. The Court explained that without more specific language or evident intent by the General Assembly, the Court could not conclude the Wage Claim Act provided for a director or agent's personal liability for unpaid wages of the corporation's former employees. *Id.* The Supreme Court emphasized in *McMorris* the importance of maintaining the corporate shield that protects officers and directors from liability except in "extraordinary circumstances." *Id.*

Even though the *McMorris* case involved the interpretation of a different statute, the rationale expressed by the Colorado Supreme Court therein must be analyzed to determine its applicability to other statutes, specifically, the TFS. At the outset it must be noted that like the Wage Claim Act, the TFS does not expressly state that officers, directors or agents will be personally liable for their corporation's failure to hold moneys in trust for the benefit of material suppliers or subcontractors. However, unlike the situation in *McMorris,* this is not atypical of like statutes in sister states. *See, e.g.,* MICH. COMP. LAWS. ANN. § 570.151 (1996);

N.Y. LIEN LAW § 70 (1993); TEX. PROPERTY CODE ANN. § 162.001 (1997). *But see, e.g.,* MD. CODE ANN, REAL PROP. § 9-201-9-202 (1995).

 Of more import is an analysis of whether the fiduciary duty implicit in the TFS constitutes one of the "extraordinary circumstances" referenced by the *McMorris* Court wherein personal liability of officers and directors for corporate obligations is recognized. *Id.* It is undisputed that a corporation is always a separate entity distinct from its officers, directors, or investors. *Newport Steel Corp. v. Thompson,* 757 F.Supp. 1152, 1156 (D.Colo.1990). Likewise, "[i]n the absence of some exception, neither the officers nor the directors of a corporation are personally responsible for the debts of a corporation merely because they are officers or directors of the corporation." *McMorris,* at 332 (citing William Meade Fletcher, *Fletcher Cyclopedia Corporations* § 1117 (Perm. Ed.2002 rev. vol. 3A)). However, unlike the situation under the Wage Claim Act as interpreted in *McMorris,* general corporate law has long recognized that any corporate officer or director who knowingly causes the misappropriation of trust property by the corporation is personally liable for participation in the breach of trust committed by that entity. 4 *Scott on Trust* § 326.3 (4th ed.2001), *See, e.g., In re Interstate Agency, Inc.,* 760 F.2d 121, 125 (6th Cir.1985); *In re Baird,* 114 B.R. 198, 204 (9th Cir. BAP 1990); *In re Folliard,* 10 B.R. 875, 876 (D.Md.1981).

Perhaps more significantly, the TFS was amended in the year 2000. Those Colorado cases previously cited holding officers personally liable under that statute for trust fund violations were decided many years prior to this amendment. It is well

---

**9.** The Court found significant that similar statutes from other states have specific language creating officer and agent liability. *Id.* at 327.

established that the General Assembly is presumed to be cognizant of the judicial precedent in a particular area when it enacts legislation in that area and as such, the construction previously placed on the statute by case law is deemed approved to the extent that the provision remains unchanged. *See Rauschenberger v. Radetsky,* 745 P.2d 640, 643 (Colo.1987).

For those reasons, this Court believes the dictates of the *McMorris* case do not apply to the TFS and thus, sees no reason to stray from the previously enunciated legal conclusions of the Colorado Court of Appeals. Therefore, the Court finds that under the TFS, the Regans, acting as the sole officers, directors and managers of Eagle, are personally liable for the debt incurred by Eagle to Fowler.

**D. Has Nondischargeability Under 11 U.S.C. § 523(a)(4) been Established.**

 Even if the Regans have personal liability to Fowler under the TFS, does this equate to a non-dischargeable debt under 11 U.S.C. § 523(a)(4)? The types of nondischargeable debts as defined in the Bankruptcy Code are extremely narrow. *See, e.g., In re Miller,* 156 F.3d 598, 602 (5th Cir.1998). However, this Court cannot employ a construction so narrow as to eviscerate § 523(a)'s purpose of preventing debtors from avoiding, through bankruptcy, the consequences of their wrongful conduct. *In re Ellison,* 296 F.3d 266, 271 (4th Cir.2002). *See, e.g., In re Baird,* 114 B.R. 198, 205 (9th Cir. BAP 1990) (Corporate officers cannot avoid application of § 523(a)(4) by substituting the corporation as the fiduciary); *In re Magpusao,* 265 B.R. 492, 497 (Bankr.M.D.Fla. 2001) ("Exceptions to discharge prevent a debtor from avoiding the consequences of wrongful conduct by filing a bankruptcy case."); *In re Portner,* 109 B.R. 977, 985 (Bankr.D.Colo.1989) (noting the need to balance "the fresh start policy [with] preventing a dishonest debtor from avoiding through bankruptcy the consequences of wrongful ... conduct.").

As best stated by a sister bankruptcy court in Florida:

> When a corporation as an entity is placed in a fiduciary capacity it is the corporate officer who is charged with performing the fiduciary duties and living up to the terms of the agency. If the fiduciary relationship is not imposed upon the corporate officer charged with maintaining the fiduciary relationship, then § 523(a)(4) could be rendered meaningless in cases where the fiduciary relationship is established between a creditor and a corporate fiduciary only. All a debtor would have to do to avoid § 523(a)(4) is place the corporation in the position as a fiduciary rather than himself. He could then breach the fiduciary relationship with impunity.

*In re Koszuth,* 43 B.R. 104, 108 (Bankr. N.D.Fla.1984).

The TFS has created a fiduciary obligation upon "controlling" officers and directors of contractors to insure that monies received from construction projects are used to pay the suppliers and materialmen who contributed to a project's completion. When a conscious decision is made by those officers or directors to redirect the statutorily-created trust funds to other corporate or personal purposes, they must suffer the consequences of those actions even if they seek the protection of the bankruptcy laws.

**CONCLUSION**

For the foregoing reasons, it is

ORDERED that the debt owed to Fowler & Peth, Inc., in the amount of $48,185.03 is nondischargeable in Jeffrey

and Kerrie Regan's individual bankruptcy case pursuant to 11 U.S.C. § 523(a)(4).